State of MAINE, Maine Chamber of Commerce, Atlantic Salmon of Maine, LLC, Stolt Sea Farm, Inc., Maine Aquaculture Association, Maine Pulp and Paper Association, Wild Blueberry Commission of Maine, Jasper Wyman & Sons, Cherryfield Foods, Inc., Plaintiffs

v.

Gale A. NORTON, in her Official Capacity as Secretary of the United States Department of the Interior, Steven A. Williams, in his Official Capacity as Director of the United States Fish and Wildlife Service, Donald L. Evans, in his Official Capacity as Secretary of the United States Department of Commerce, William T. Hogarth, in his Official Capacity as the Assistant Administrator for Fisheries of the National Marine Fisheries Service, Defendants

No. CIV. 00–250–BC.

United States District Court, D. Maine.

April 24, 2003.

Peter W. Culley, Pierce, Atwood, Portland, ME, for Maine State Chamber of Commerce, Atlantic Salmon of Maine, LLC, Maine Acquaculture Ass'n, Stolt Sea Farm Inc., Maine Pulp & Paper Ass'n, Wild Blueberry Com'n of Maine, Jasper Wyman & Sons, Cherryfield Foods Inc.

Christopher C. Taub, Augusta, ME, Paul A. Lenzini, Alexandria, VA, for Maine, State of, Plaintiff.

Adam Issenberg, U.S. Dept. of Justice, Mary Whittle, U.S. Department of Justice, Washington, DC, for All Defendants.

Adam Issenberg, U.S. Dept. of Justice, U.S. Dept. of Justice, Washington, DC, for U.S. Secretary of the Interior, Defendants.

Eric Glitzenstein, Howard M. Crystal, Meyer & Glitzenstein, Washington, DC, Kirk G. Siegel, Hanley & Assoc., South Paris, ME, for Defenders of Wildlife, Biodiversity Foundation, Conservation Action Project, Forest Ecology Nework, Coastal Waters Project, David Carle, Charles Fitzgerald, Douglas Watts, and Amicus Plus.

Howard M. Crystal, Meyer & Glitzenstein, Washington, DC, for Arthur Taylor.

## MEMORANDUM OF DECISION AND ORDER

GENE CARTER, Senior District Judge.

On November 17, 2000, the United States Fish and Wildlife Service ("FWS") and National Marine Fisheries Service ("NMFS") (collectively "the Services") published their determination listing the Gulf of Maine distinct population segment ("DPS") of Atlantic salmon as endangered under the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.* *See* 65 Fed.Reg. 69459, reproduced at 2000 AR 5040. The Court now has before it Plaintiffs', the State of Maine ("the State"), Maine Chamber of Commerce, Atlantic Salmon of Maine, LLC, Stolt Sea Farm, Inc., Maine Aquaculture Association, Maine Pulp & Paper Association, Wild Blueberry Commission of Maine, Jasper Wyman & Sons, Cherryfield Foods, Inc. ("the Maine Businesses") motions for summary judgment which challenge the listing of the Gulf of Maine Atlantic salmon. *See* Plaintiff Maine Businesses' Motion for Summary Judgment (Docket Item No. 61); Plaintiff State of Maine's Motion for Summary Judgment (Docket Item No. 62). The State's Complaint asserts that, on nine separately listed grounds pursuant to the Administrative Procedures Act ("APA"), 5 U.S.C. § 701 *et seq.,* the listing decision "is arbitrary, capricious, an abuse of discretion and/or otherwise not in accordance with law." The Maine Businesses raise four separate claims: (1) that the distinct population segment designa-

tion is both procedurally and factually illegal because it was not based on the best scientific and commercial data; (2) that the listing failed to provide a summary showing the relationship of the data relied upon to the final listing rule and that the designation of the Gulf of Maine distinct population segment is overly broad and unduly vague so as to violate the constitutional requirements of due process; (3) that the decision to list the Gulf of Maine distinct population segment now, without extending time for decision to allow for consideration of the National Academy of Sciences' study and without allowing interested parties sufficient notice and opportunity to comment, is arbitrary and capricious, an abuse of discretion, and against substantial evidence; and (4) that the ESA unconstitutionally delegates legislative authority regarding what constitutes a distinct population segment and that the ESA provision authorizing the listing of a distinct population segment is an unconstitutional violation of the Commerce Clause. *See* Complaint of the Maine Businesses. Defendants, Gale A. Norton, U.S. Secretary of the Interior, Steven A. Williams, Director of the United States Fish and Wildlife Service, Donald L. Evans, U.S. Secretary of Commerce, and William T. Hogarth, Assistant Administrator for Fisheries, National Marine Fisheries Service also move for summary judgment. Defendants' Cross Motion for Summary Judgment (Docket Item No. 70).

■ The ESA is " 'the most comprehensive legislation for the preservation of endangered species ever enacted by any nation.' " *Strahan v. Coxe,* 127 F.3d 155, 161 (1st Cir.1997) (quoting *Tennessee Valley Auth. v. Hill,* 437 U.S. 153, 180, 98 S.Ct. 2279, 2294, 57 L.Ed.2d 117 (1978)). The ESA was enacted based on the finding that many "species of fish, wildlife, and plants in the United States have been rendered extinct as a consequence of economic growth and development untempered by adequate concern and conservation," while other species "have been so depleted in numbers that they are in danger of or threatened with extinction." 16 U.S.C. § 1531(a). As the Supreme Court has explained, "[t]he plain intent of Congress in enacting th[e] statute was to halt and reverse the trend toward species extinction, whatever the cost." *Hill,* 437 U.S. at 184, 98 S.Ct. at 2297. Responsibility for implementing the ESA rests with the Secretaries of Commerce and Interior, who have delegated these responsibilities to the FWS and NMFS. *See* 16 U.S.C. § 1532(15); 50 C.F.R. § 402.01(b). The ESA requires the Services to issue rules to protect "species"—defined to include "any distinct population segment of any species." 16 U.S.C. § 1532(16). Species are required to be protected, or "listed," if they are "endangered" or "threatened." 16 U.S.C. § 1533(a)(1).

A species is "endangered" where it "is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A species is "threatened" if it "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20). Section 4 of the Act sets forth a non-discretionary duty requiring the Services to list a species if one or more of five factors are met:

(A) the present or threatened destruction, modification, or curtailment of its habitat or range;

(B) overutilization for commercial, recreational, scientific, or educational purposes;

(C) disease or predation;

(D) the inadequacy of existing regulatory mechanisms; or

(E) other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(1). In addition, the Act requires that the Services make their listing decisions "solely on the basis of the best scientific and commercial data available." 16 U.S.C. § 1533(b)(1)(A). Once listed, the ESA requires that the Services take affirmative steps to recover listed species. 16 U.S.C. § 1533(f). Unless issued a permit, it is illegal to "take" a listed species, 16 U.S.C. § 1538(a)(1). *See* 16 U.S.C. § 1536 (federal agency permitting process), § 1539 (private party permitting process).

### STATEMENT OF FACTS

■ A Statement of Material Facts "as to which the moving party contends there is no genuine issue of material fact to be tried" serves limited purpose in cases brought pursuant to the APA because, as a general rule, all relevant facts are contained in the administrative record for such a case, and, as a result, there are no material facts in dispute. Under section 706 of the APA, the Court's role is to determine whether the administrative agency was "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law" in making the findings challenged by Plaintiffs. 5 U.S.C. § 706(2)(A). Because this case involves a challenge to a final administrative action, the Court's review is limited to the administrative record. *See* 5 U.S.C. § 706; *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973). Summary judgment is an appropriate procedure for resolving a challenge to a federal agency's administrative decision when review is based upon the administrative record, even though the court does not employ the standard of review set forth in Rule 56. *See, e.g., Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44, 105 S.Ct. 1598, 1607, 84 L.Ed.2d 643 (1985); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28

L.Ed.2d 136 (1971); *Richards v. I.N.S.*, 554 F.2d 1173, 1177 n. 28 (D.C.Cir.1977).

Notwithstanding the foregoing, the Court provides the factual materials, taken from the Statements of Material Facts submitted by the parties in support of their respective summary judgment motions, to highlight appropriate portions of the complex administrative record of this case. The Court notes, however, that the listing decision was based on the entire administrative record.

### The Atlantic Salmon

Atlantic salmon (*Salmo salar*) are an anadromous species of fish that is born and reared as a juvenile in freshwater rivers before migrating to the marine environment for ocean feeding as an adult. After spending one or more winters in the northwest Atlantic Ocean, adults return to their native freshwater rivers to spawn. *See, e.g.*, 60 Fed.Reg. 14410–11 (March 17, 1995), reproduced at 1997 AR 1294; 1999 Status Review, reproduced at 2000 AR 3064–72. Adult salmon generally spawn in October and November and deposit their eggs into nests in the beds of rivers, referred to as "redds." 60 Fed.Reg. 14410–11, reproduced at 1997 AR 1294. The eggs generally hatch in March and April, and the young salmon, referred to as "alevins," remain in the redds for approximately six weeks. *Id.* When they emerge from the redds and begin feeding, they are referred to as "fry." 60 Fed.Reg. 14411, reproduced at 1997 AR 1295. As they continue to grow, they develop vertical bars on the sides of their bodies and are then referred to as "parr." *Id.* When parr become two to three years old, they undergo various morphological and physiological changes which allow them to make the transition from fresh water to salt water. *Id.* After this process is complete, they are referred to as "smolt." *Id.* Smolts descend the rivers and migrate to the sea in

the spring, and generally spend one or two winters at sea. *Id.* In the spring, they return to fresh water, where they then spawn and repeat the life cycle. *Id.*

Atlantic salmon can be found in Europe, Canada, and the United States. 65 Fed. Reg. 69465, reproduced at 2000 AR 5046. In the United States, anadromous Atlantic salmon were historically native to nearly every major coastal river north of the Hudson River, including 28 or more rivers in Maine. 1999 Status Review, reproduced at 2000 AR 3073. The Services have found that historic United States Atlantic salmon populations were comprised of three population segments found in rivers draining in Long Island Sound, central New England, and the Gulf of Maine, respectively. 65 Fed.Reg. 69459, reproduced at 2000 AR 5046; *see also* 1999 Status Review, 2000 AR 3092–98. By the early 19th Century, Atlantic salmon runs in New England had been severely depleted as a result of over-fishing, water quality degradation, and barriers to migration. 1999 Status Review, reproduced at 2000 AR at 3073. By the end of the 19th Century, Atlantic salmon had been eliminated from southern New England rivers and the southern extent of the species' distribution had been shifted approximately 2 north in latitude and 4 east in longitude. *Id.* During recent decades, the status of wild Maine Atlantic salmon became a cause of increasing concern. *See* Status Review Ref. Doc. 31, at 130 (noting that decline of wild Atlantic salmon "is well-documented in the last decade"); *see also* 2000 AR 5519 (noting decline in sport catch from 513 in 1980, to 194 in 1990, to 12 in 1999); *id.* at 3700 (describing declines in adult returns to several downeast rivers).

NMFS and FWS, and their predecessor federal agencies, and the State of Maine have been working to conserve Atlantic salmon for nearly 130 years. *See* Status Review AR Doc. 28 at 95. Despite these efforts, the numbers of Gulf of Maine Atlantic salmon are now at historically low abundance levels. *See* 2000 AR 2760. The numbers of spawning adults is generally depressed and, as a result, low numbers of juvenile salmon are entering the ocean. 2000 AR 3129–30. For example, from 1986 to 1988, the number of returning adults declined 99.7 percent for the Dennys River and 93 percent for the Narraguagus River. 2000 AR 3700. To support the rehabilitation of Atlantic salmon, FWS maintains two federal hatcheries and an anadromous fish coordinator in Maine dedicated to this purpose. One of the hatcheries, Craig Brook National Fish Hatchery, has been converted for the sole purpose of recovering DPS salmon. *See* 1999 Status Review, 2000 AR at 3137. In addition, FWS has conducted research on the biology and life history of Atlantic salmon. *See, e.g.*, 1997 Status Review AR Ref. Doc. 28 (Age, Growth and Mortality of Juvenile Atlantic Salmon in Streams (1987)); *id.* Ref. Doc. 39 (Species Profile on Atlantic Salmon (1984)).

**Efforts to Conserve Atlantic Salmon**

The first action taken by the Services with respect to the status of Atlantic salmon and the ESA occurred in November 1991. Responding to declining adult returns in several eastern Maine rivers, FWS designated salmon in five of these rivers—Narraguagus, Dennys, Pleasant, Machias, and East Machias—as Category 2(C–2) candidate species under the ESA. A C–2 candidate species is a "[t]axa for which information now in the possession of the Service indicates that proposing to list as endangered or threatened is possibly appropriate, but for which conclusive data on biological vulnerability and threat are not currently available." 1997 AR 10. By October 1992, the State of Maine and had FWS completed a Prelisting Recovery

Plan designed to identify and reduce threats and increase salmon populations in the five rivers before such time as listing under ESA became necessary. *See* 1997 AR 14. The goals were: (1) to increase populations in C–2 rivers; (2) to establish weirs; (3) to characterize genetic composition; (4) to identify, monitor, and try to reduce threats in each river; and (5) to inventory and summarize habitat status. 1997 AR 17. The plan also documented the 1991 decision by FWS and the State of Maine to begin using river-specific stocks for recovering the depressed populations. *See* 1997 AR 15.

### The Services Propose Listing Maine Rivers as a DPS

Implementation of the Prelisting Recovery Plan was underway when, in October and November 1993, the Services received petitions to list under the ESA Atlantic salmon throughout its United States range. *See* 1997 AR 48, 68; 59 Fed.Reg. 3067, reproduced at 1997 AR 244. The Services published a 90–day finding on January 20, 1994, announcing their finding that, "the petition presents substantial information indicating that the proposed action may be warranted." 1997 AR 244; 59 Fed.Reg. 3067, reproduced at 1997 AR 244. The Services stated that, to the best of their knowledge, the only remaining populations were believed to consist of native fish in seven downeast Maine rivers— the Dennys, Machias, East Machias, Narraguagus, Pleasant, Ducktrap, and Sheepscot Rivers. *See id.* The Services then stated that they would conduct a "Status Review" and, thereafter, the Services formally agreed to exercise joint jurisdiction over Atlantic salmon. *See* 1997 AR 333.

The Services convened a Biological Review Team ("BRT") to prepare a Status Review regarding the Atlantic salmon in the seven rivers. A draft Status Review was completed in January 1995. *See* 1997 AR 773. The 1995 Status Review includes river profiles on each of the DPS rivers. The profiles review the history of salmon populations and discuss their present status. *See* 1995 Status Review, 1997 AR 773 at 76–113. The draft analyzed the status of the species rangewide and concluded that remnant populations existed in seven Maine rivers and that those populations were in danger of extinction. *Id.* at 778– 80. To determine whether the Atlantic salmon populations in the seven Maine rivers constituted a "species" as it is defined in the ESA, the BRT applied the Policy on Applying the Definition of "Species" Under the Endangered Species Act to Pacific Salmon ("Pacific Salmon DPS Policy") for guidance.[1] *Id.* at 794–95. *See generally* 56 Fed.Reg. 58612 (Nov. 20, 1991), reproduced at DPS Policy AR 171. Under the Pacific Salmon DPS Policy, a stock of Pacific salmon is considered a distinct population segment for the purposes of the ESA if it represents an evolutionarily significant unit ("ESU") of the biological species. A stock is considered an ESU if it meets both of the following criteria: (1) it is substantially reproductively isolated from other conspecific population units; and (2)

---

1. For the 1995 Status Review, the BRT applied the Pacific Salmon DPS Policy to the Gulf of Maine salmon population as a tool to determine whether the population qualified as a species under the ESA. *See* 1997 AR 795. At that time, the Services had no policy for delineating a DPS of any other species. *See* 61 Fed.Reg. 4722 (Feb. 7, 1996), reproduced at DPS Policy AR 637. The BRT noted that the Pacific salmon DPS policy was developed specifically for Pacific salmon but that, "[b]ecause the structure of Atlantic salmon populations is similar to that of Pacific salmonines, the ESU approach provides a practical foundation for delineating the Distinct Population Segments (DPS) of Atlantic salmon under the ESA." 1997 AR 795. In the analytical portion of this opinion, *infra* II(A)(2), the Court discusses the facts relevant to the development of the Pacific Salmon DPS Policy.

it represents an important component of the evolutionary legacy of the species. *Id.* at 58618.

Evidence before the BRT in the 1995 Status Review suggested that, throughout their range, Atlantic salmon are naturally substructured into genetically differentiated and reproductively isolated populations within and among river drainages. *See* 1999 Status Review AR Docs. 47, 179, 298, 325, and 336; 1995 Status Review, reproduced at 1997 AR 773. Based upon phenotypic traits, life history traits, and habitat characteristics, the BRT concluded that there was strong evidence that United States stocks of Atlantic salmon are distinct from stocks in Canada and Europe. 1995 Status Review, 1997 AR at 794–801. The BRT further concluded that the populations of anadromous Atlantic salmon in the Sheepscot, Ducktrap, Narraguagus, Pleasant, Machias, East Machias, and Dennys River represent the last wild remnant of United States Atlantic salmon. *Id.*

On March 17, 1995, after completing the status review, the Services determined that Atlantic salmon, throughout their entire range, did not meet the definition of a "species" under the ESA and, therefore, that listing said salmon under the ESA was not warranted. 60 Fed.Reg. 14410, reproduced at 1997 AR 1294. Specifically, the Services found that Atlantic salmon populations in rivers south of Maine's Kennebec River were extirpated during the nineteenth century, and that current Atlantic salmon in those rivers were the result of restoration efforts using nonindigenous stocks and, according to the Services, were, therefore, not eligible for listing under the ESA. 60 Fed.Reg. 14411, repro-

duced at 1997 AR 1295. However, the Services determined that Atlantic salmon populations in seven Maine rivers—the Dennys, East Machias, Machias, Pleasant, Narraguagus, Ducktrap, and Sheepscot Rivers—were "indigenous," and met the criteria to be considered a DPS eligible for protection under the ESA.[2] 60 Fed.Reg. 14412, reproduced at 1997 AR 1296.

On September 29, 1995, the Services published a proposed rule to list a DPS in the seven Maine rivers as threatened under the ESA. 60 Fed.Reg. 50530 (Sept. 29, 1995), reproduced at 1997 AR 1698. At that time, the Services designated four other rivers—the Penobscot, St. Croix, and Kennebec Rivers, and Tunk Stream—as candidates pending further review. *Id.* at 50531. The Services concluded that three major factors threatened the continued survival of Atlantic salmon within the DPS: poaching, low natural survival of fish during the first winter at sea, and potential impacts from aquaculture operations and fish hatcheries. *Id.* at 50533; *see also* 1995 Status Review reproduced at 1997 AR 773.

### The State of Maine's Conservation Plan

At the same time that. they proposed listing the Atlantic salmon in the seven rivers as a DPS, the Services invited the State to prepare a conservation plan that would permit the State "to maintain the lead role in the management of activities that could impact Atlantic salmon in the DPS."[3] 60 Fed.Reg. at 50535, reproduced at 1997 AR 1703. The Services set forth their recommendation that a conservation

---

**2.** Atlantic salmon in the Penobscot and Union Rivers were not included in the DPS, despite the fact that these rivers are straddled by the other DPS rivers. 60 Fed.Reg. 14412, reproduced at 1997 AR 1296, 2000 AR 3074.

**3.** The ESA requires the Services to take into account "those efforts, if any, being made by any State or foreign nation to protect such species ... within any area under its jurisdiction." 16 U.S.C. § 1533(b)(1)(A).

plan contain certain elements and address certain threats including, among other things, threats arising from activities such as recreational fishing, habitat modification, and aquaculture. *Id.* In October 1995, Maine established a task force charged with developing a conservation plan. *See* 62 Fed.Reg. 66235, 66335 (Dec. 18, 1997), reproduced at 1997 AR 5794. A variety of interested parties participated in the development of the conservation plan, including the Services as advisors. *See* 62 Fed.Reg. 66235, 66335, reproduced at 1997 AR 5794.

The State submitted its final Conservation Plan for Seven Maine Rivers ("Conservation Plan") to the Services on March 5, 1997. 1997 AR 4288. The Conservation Plan identified potential threats to Maine Atlantic salmon and included ongoing and proposed actions to reduce potential threats to Atlantic salmon and its habitat. 62 Fed.Reg. at 66335, reproduced at 1997 AR 5794. The comprehensive plan included a five-year implementation schedule that assessed all actual and potential threats to Atlantic salmon in Maine waters, and set forth a detailed action plan with concrete steps and benchmarks for State agencies, federal agencies, and private stakeholders. *See* 1997 AR 4288–4727. The Conservation Plan required annual progress reports. *See* 62 Fed.Reg. at 66337, reproduced at 1997 AR 5796. At that time, the State asked that the Services withdraw the proposed rule in light of, among other things, the significant protections afforded to Atlantic salmon under the Conservation Plan. *See* 62 Fed.Reg. 28413–14, reproduced at 1997 AR 4909.

The Services reviewed the Conservation Plan and gave the public an opportunity to comment on the plan. 62 Fed.Reg. 28413 (May 23, 1997), reproduced at 1997 AR 4908. After consideration of the current status of the DPS, the Conservation Plan, and other efforts being made to protect the species, the Services concluded that the threats to the species had been reduced and the ongoing efforts, including the Conservation Plan, "will facilitate the continued rehabilitation of the seven rivers DPS." 62 Fed.Reg. at 66337, reproduced at 1997 AR 5796. At that time, the Services found "that the seven rivers DPS of Atlantic salmon is not likely to become endangered in the foreseeable future and that, therefore, listing is not warranted at this time." *Id.* The Services indicated, however, that they would continue to monitor the status of the species and that a decision to reinitiate the listing process might be made in the event of an emergency or, if there was insufficient progress in implementation of the Conservation Plan, after a progress report. On this basis, the Services concluded that the DPS was not threatened with extinction and withdrew the proposed rule to list. *Id.* The Services also renamed the DPS the "Gulf of Maine DPS" in recognition of the fact that other populations found to be naturally reproducing and demonstrating historical, river-specific characteristics might be added to the DPS. *See* 62 Fed.Reg. at 66337, reproduced at 1997 AR 5796.

### Proposed and Final Listing Rules

The Services completed an updated Status Review in July 1999, which was made public in October. *See* 2000 AR 3049. Instead of using the Pacific Salmon DPS Policy as the Services had done in the 1995 Status Review, the Services employed the "Policy Regarding the Recognition of Distinct Vertebrate Population Segments under the Endangered Species Act" ("Joint DPS Policy"). *See* 61 Fed.Reg. 4722, reproduced at DPS Policy AR 637. The Joint DPS Policy was finalized in Febru-

ary 1996 for all vertebrate populations.[4]

In the 1999 Status Review, to determine whether the Gulf of Maine salmon populations are separate from other populations, the BRT considered: (1) whether the population has persisted, (2) the history of fish stocking into the Maine rivers, (3) the geographic segregation of the Gulf of Maine population from other populations, and (4) the genetic differences observable between the Gulf of Maine population and other populations. *See* 65 Fed.Reg. at 69460, reproduced at 2000 AR 5040. The BRT considered that salmon were extirpated from a river if there was a documented absence of salmon for two generations or twelve years. *See* 1999 Status Review, reproduced at 2000 AR 3091. "At any one point in time, there are usually 5 or more different generations, or year classes, of a river population in existence. A failure of one spawning year class does not necessarily represent extinction." 65 Fed.Reg. at 69464, reproduced at 2000 AR 5045. The BRT noted in the 1999 Status Review that "[r]eproductive isolation does not have to be absolute to allow evolutionarily important differences to accrue in different population units, only strong enough for these differences to develop and be maintained." 1999 Status Review, 2000 AR 3099. The BRT found that "[g]eographical distance, behavioral difference, and/or temporal segregation of spawners can maintain reproductive isolation. The occurrence of nonindigenous Atlantic salmon in a stream does not necessarily represent a breakdown of reproductive isolation unless these fish spawn

successfully, their progeny survive to spawn, and their presence degrades the survival and fitness of native stocks. In fact, some genetic exchange between populations helps to maintain fitness by countering genetic drift (Waples 1991)." 1999 Status Review, reproduced at 2000 AR at 3099–3100.

The 1999 Status Review found that Atlantic salmon exhibit homing behavior and return to their natal stream to spawn. This homing behavior results in genetic differentiation because local populations do not interbreed extensively with other local populations. 1999 Status Review AR Doc. 28 at 4. Protecting local salmon populations is important because they are reproductively isolated from each other and are adapted to the specific river that they inhabit. *Id.* During return migration to natal rivers for spawning, Maine salmon are known to stray to other rivers at a rate of 1–2%, creating gene flow among individual river stocks.[5] *See* 1999 Status Review, reproduced at 2000 AR 3100.

Prior to 1971, stocking success was relatively poor. Historical records indicate that "early fry stocking methods were dominated by cluster stocking of large numbers of fry in limited areas of a river." 1999 Status Review, reproduced at 2000 AR 3078; *see* 1999 Status Review AR Doc. 28 at 123. The early efforts "were limited in technology, distribution capabilities, and knowledge of stocking strategies," and, the BRT found that these stocking efforts "resulted in only negligible adult returns." 1999 Status Review, reproduced at 2000

---

**4.** When the BRT conducted the 1999 Status Review, the team determined that the Joint DPS Policy published in February 1996 should be applied to the Gulf of Maine salmon population to determine whether it qualifies as a "species." *See* 2000 AR 3088. In the analytical portion of this opinion, *infra* II(A)(3), the Court will discuss the facts rele-

vant to the development of the Joint DPS Policy applicable to all vertebrate populations.

**5.** Salmon stocks in Norway are considered discrete despite higher straying rates than those observed on Maine rivers. *See* 1999 Status Review AR Docs. 125 and 163.

AR 3087. Reports indicate that stocking had some small impact while it was happening but, once the stocking ceased, the number of adult return rates would revert to the number observed before the stocking took place. *Id.* During the 100 years prior to 1970, the Dennys River was stocked 37 times, the Narraguagus River was stocked 34 years, the Machias River was stocked 28 years, the Sheepscot River was stocked 19 years, the East Machias River was stocked 3 years, and the Pleasant River was stocked 11 years. The Ducktrap and Cove Brook Rivers were not stocked at all. *See* 1999 Status Review AR Doc. 28, at 197–224. There were gaps of years and even decades between stocking events in individual rivers, rendering the stocking impact sporadic and, thus, limited. *Id.* Even for native strains, only a small fraction of one percent of the stocked fry would survive and return as spawning adults that could breed in a river. *See* 1999 Status Review Ref. Doc. 28, at 31–34.

After 1971, the majority of stocking from non-DPS sources was from the Penobscot River, which, although not designated a Gulf of Maine DPS river, is within the geographic range of the DPS. *See* 1999 Status Review, reproduced at 2000 AR 3090–87. The Penobscot hatchery stock was largely developed from DPS stocks, especially from the Narraguagus and Machias Rivers, so the majority of fish stocked into DPS rivers was derived from DPS stocks. *Id.* at 3078. The last year that the Penobscot was stocked with Canadian fish from the Miramichi River was 1968. *See* 65 Fed.Reg. 69465, reproduced at 2000 AR 5046. In the 1999 Status Review, the BRT examined the effect of stocking practice on the Gulf of Maine population. They stated that:

> The fact that artificial selection of hatchery environments has had some influence upon the present genome of the Gulf of Maine DPS can not be totally negated. Given our current understanding of the genetic composition of these stocks (Bentzen and Wright 1992; Kornfield 1994; King *et al.* 1999), the documented persistence of native stocks (Kendall 1935; Baum 1997), and the fact that most of the hatchery stocking influences were internal to the Gulf of Maine DPS and the Penobscot River Hatchery stock (Table 4.2.2.)(Baum 1997), the BRT concludes that the influence of hatchery fish upon the DPS has not been sufficient to completely or substantially introgress with the remnant populations and genomes of the Gulf of Maine DPS.

1999 Status Review, reproduced at 2000 AR 3111.

The Services used zoogeographic maps to determine what rivers likely exerted different evolutionary pressures on Atlantic salmon. *See* 65 Fed.Reg. 69459, reproduced at 2000 AR 5040. The DPS rivers are substantially different ecologically from rivers north and south. *See* 1999 Status Review, reproduced at 2000 AR 3107, 3096. The Gulf of Maine population lives at what is now the southern extent of the North American range of Atlantic salmon. *See* 1999 Status Review, reproduced at 2000 AR 3106. The Gulf of Maine salmon also ranges in a unique ecoregion called the Laurentian Mixed Forest Province of coastal Maine, *id.*, and the DPS rivers are short coastal rivers. *Id.* at 3107. While Maine and Canadian salmon have different freshwater ranges, both populations range during their marine life to the northwest Atlantic Ocean. *Id.* To survive, the Maine Atlantic salmon populations had to adapt to distinct physical and environmental conditions. *Id.* ("Occupation of the southern portion of the range exposes U.S. salmon to riverine and oceanic selection factors different from those experienced by more northern

stocks.") Physical displacement from a fish's natal river leads to lowered success, which implies that local populations are adapted to local conditions and that selection is ongoing. The further fish are displaced from their natal rivers, the less successful the fish are. *See* 1999 Status Review AR Docs. 288 and 298.

At the time of listing, the Services · did not have enough information to include the Penobscot River north of the Bangor dam in the DPS. *See* 1999 Status Review, reproduced at 2000 AR 3097. The 1999 Status Review found that "[b]ecause potentially important and heritable adaptations are needed for larger river systems, it would be premature to determine the status of [the Penobscot River] population in relationship to the Gulf of Maine DPS without comprehensive genetic data." *Id.*

The 1999 Status Review examined the phenotypic and life history characteristics of Maine salmon versus Canadian salmon and concluded that "the DPS has unique life history characteristics that have a heritable basis" and that "both environmental and genetic factors make the Gulf of Maine DPS markedly different from other populations of Atlantic salmon in their life history and ecology." 2000 AR 3110. Indeed, the Governor's Maine Atlantic Salmon Task Force found that "[i]t is generally accepted that there are several life history characteristics which distinguish Canadian and U.S. fish." 2000 AR 7060. An extensive, range-wide population genetics survey of mitochondrial and nuclear DNA variation in Atlantic salmon, with an emphasis on Maine rivers, found significant genetic differences between Maine salmon and Canadian salmon. *See* 1999 Status Review AR Doc. 181. In addition to standard analyses of genetic differences, the survey conducted assignment tests and, based on genetic typing, correctly assigned

fish to the continent of origin (*i.e.* North American fish to North America and European fish to Europe) 100% of the time. *Id.* at 4. Canadian fish were correctly assigned to Canada 93.9% of the time, and U.S. fish were correctly assigned to the U.S. 77.3% of the time. *Id.* at 4. U.S. fish were correctly assigned to their individual river of collection 41.5% of the time. *Id.* at 29.

The genetic data that the Services collected confirm the scientific assumptions that can be drawn from the unique ecological setting of the DPS rivers and the unique life history and physical characteristics of Maine salmon. *See* 1999 Status Review AR Doc. 181. The 1999 Status Review found that "[t]hese data indicate that observed genetic differences between U.S. and Canadian Atlantic salmon stocks might represent important population differentiation. This differentiation is reinforced by the spacial distribution of Atlantic salmon rivers and differences in life history." 1999 Status Review, reproduced at 2000 AR 3102.

The Status Review concluded "[t]he analysis of listing factors in 1999 clearly indicates that all threats to the species have not been removed." 2000 AR 3245. Based on the results from the 1999 Status Review, the Services decided to add salmon in an eighth waterway—Cove Brook—to the DPS. *See* 64 Fed.Reg. 62638, reproduced at 2000 AR 4055; 1999 Status Review, reproduced at 2000 AR 1. With the river profiles from the 1995 Status Review and other studies, the Services determined that wild salmon populations persisted in eight Maine rivers. *See* 1999 Status Review, 2000 AR 3097.

On November 17, 1999, the Services proposed listing the Gulf of Maine DPS as endangered.[6] 64 Fed.Reg. 62627, repro-

---

**6.** The proposed rule described the bases for listing as new disease and genetic threats,

duced at 2000 AR 4044. The Services solicited public comment on the proposed rule. All together, the Services received over 200 written comments. The State of Maine submitted comments, disagreeing with the listing and challenging the application of the DPS policy to the Atlantic salmon. *See* 65 Fed.Reg. 69459, 69463 (Nov. 17, 2000), reproduced at 2000 AR 5044. The Services arranged for peer review of the proposed rule. Three reviewers responded. One reviewer did not believe that there was sufficient evidence for a DPS designation, but the other two supported the DPS determination. *See* 65 Fed.Reg. at 69463, reproduced at 2000 AR 5044. On November 17, 2000, the Services published a final rule designating the Gulf of Maine DPS as endangered.[7] *See* 65 Fed.Reg. 69459, reproduced at 2000 AR 5040.

## ANALYSIS

### I. Jurisdiction of the Court— Plaintiffs' Standing

 Standing is a threshold jurisdictional prerequisite, and the "case and controversy" requirement of Article III of the Constitution requires a plaintiff to demonstrate that it has standing to sue. *See, e.g., Allen v. Wright,* 468 U.S. 737, 750–51, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984); *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). The inquiry into standing seeks to determine "whether the litigant is entitled to have the court decide the merits of the dispute or of particular

issues." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). The party invoking federal jurisdiction bears the burden of proof in establishing all of the elements. *See Defenders of Wildlife,* 504 U.S. at 561, 112 S.Ct. at 2136. At the summary judgment stage, "the plaintiff can no longer rest on ... 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts' " validating its right to standing. *Defenders of Wildlife,* 504 U.S. at 561, 112 S.Ct. at 2137 (quoting FED. R. CIV. P. 56); *see also Lujan v. National Wildlife Federation,* 497 U.S. 871, 883–889, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)(Since they are not mere pleading requirements but, rather, an indispensable part of plaintiffs case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation.).

### A. The Maine Businesses

 Defendants argue that the Maine Business Plaintiffs' Complaint should be dismissed because they have failed to make the necessary evidentiary showing of specific facts that they themselves are among the injured. Defendants' Cross–Motion for Summary Judgment (Docket Item No. 70) at 10–11. The Maine Businesses disagree and attach affidavits from a representative of each of the Maine Business Plaintiffs which purport to satisfy the standing requirements. Plaintiff Maine

---

continuing concerns about threats posed by aquaculture escapees, lack of progress in resolving concerns over existing aquaculture practices, low juvenile in-river survival, continuing decline in adult returns and the lack of sufficient progress dealing with sport fishing. 64 Fed.Reg. at 62632–35, reproduced at 2000 AR 4049–52; *see also* 65 Fed.Reg. at 69464, reproduced at 2000 AR 5045.

**7.** Hatchery fish are also included in the DPS. *See* 65 Fed.Reg. 69459, reproduced at 2000 AR 5040. Although part of the Gulf of Maine DPS, hatchery fish will not be counted towards recovery of the DPS until the hatchery fish spawn in the wild. *Id.*

Businesses' Reply Memorandum in Support of Its Motion for Summary Judgment and In Opposition to Defendants' Motion for Summary Judgment (Docket Item No. 76) at 2. Although the parties' statements of material facts take on a different role in an APA case, the facts necessary to establish the parties' standing to bring the suit, which are not included in the administrative record of the case, must satisfy the requirements of Local Rule 56.

Local Rule 56 was carefully designed to develop the factual record and permit both parties the opportunity to dispute the facts presented by the opposing party. There being cross-motions for summary judgment filed in this case, the Maine Businesses had two opportunities to present the facts necessary to establish their standing. *See* Local Rule 56(b) and (c). Local Rule 56(b) and (c) provide:

(b) **Supporting Statement of Material Facts.** A motion for summary judgment shall be supported by a separate, short, and concise statement of material facts, set forth in numbered paragraphs, as to which the moving party contends there is no genuine issue of material fact to be tried. Each fact asserted in the statement shall be supported by a record citation as require by subsection (e) of this rule.

(c) **Opposing Statement of Material Facts.** A party opposing a motion for summary judgment shall submit with its opposition a separate, short, and concise statement of material facts. The opposing statement shall admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts and unless a fact is admitted, shall support each denial or qualification by a record citation as

required by this rule. The opposing statement may contain in a separate section additional facts, set forth in separate numbered paragraphs and supported by a record citation as required by subsection (e) of this rule.

The facts included in the affidavits are not set out in the Maine Businesses' supporting statement of material facts or in their opposing statement of material facts. By including the facts relevant to standing only in affidavits attached to their Reply/Opposition Memorandum, the Maine Businesses seek to place before the Court facts which the Services have not had the opportunity to challenge. The Maine Businesses' affidavits cannot be considered by the Court because they fail to comply with Local Rule 56. *See* Local Rule 56(e) ("The court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts."); *Learnard v. Inhabitants of Town of Van Buren,* 182 F.Supp.2d 115 (D.Me.2002). Accordingly, the Court concludes that the Services' Motion for Summary Judgment must be granted and the Maine Businesses' claims must be dismissed inasmuch as the Maine Businesses have failed to meet their burden of establishing standing to challenge the listing of the Gulf of Maine DPS of Atlantic salmon as endangered.[8]

### B. The State of Maine

Defendants also argue that the State of Maine's Complaint should be dismissed because it has failed to make the necessary evidentiary showing of specific facts that it is among the injured. Defendants' Cross–Motion for Summary Judgment (Docket Item No. 70) at 10–11. The State of

---

**8.** The Court notes that although the Maine Businesses' claims will be dismissed, the principal issues raised in their Motion for Summary Judgment have been addressed in this opinion.

Maine disagrees, responding that (1) there is no authority for the proposition that a plaintiff must automatically prove standing at summary judgment when such standing has not been challenged and (2) since Defendants did not make a lack-of-standing claim, Plaintiffs should not be required to provide evidence on the issue. This statement is simply wrong. First, there is ample authority for the proposition that it is Plaintiffs' burden to establish standing particularly where, as here, Defendants not only raised the issue of Plaintiffs' standing as an affirmative defense in their Answers, *see* Answer in Civil No. 00–250–B–C (Docket Item No. 9); Answer in Civil No. 00–254–B–C (Docket Item No. 6), but clearly raised it in their motion for summary judgment, Defendants' Cross–Motion for Summary Judgment (Docket Item No. 70) at 10–11. As discussed above, this is an issue on which Plaintiff bears the burden, and that burden is commensurate with the procedural stage of the case.

■ "The question of standing 'involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.'" *Bennett v. Spear*, 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (quoting *Warth*, 422 U.S. at 498, 95 S.Ct. at 2205). To establish constitutional standing, the plaintiff must show (1) an actual or threatened injury which is concrete and particularized; (2) a causal connection between the injury and the conduct complained of; and (3) that it is likely the injury will be redressed by a favorable decision. *See Defenders of Wildlife*, 504 U.S. at 560–61, 112 S.Ct. at 2136; *see also Bennett*, 520 U.S. at 162, 117 S.Ct. at 1161. In addition, for a party to prove that it is adversely affected by the agency action requires a showing that the injury complained of falls within the zone of interests protected or regulated by the statutory provision or constitutional guarantee

invoked in the suit. *See* 5 U.S.C. § 702 ("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."); *see also National Wildlife Federation*, 497 U.S. at 883, 110 S.Ct. at 3186. Although initially questioning the requirement of establishing that it has standing, the State goes on to assert that it has standing because the Services' decision to list Atlantic salmon injures the State in that it interferes with the State's ability to manage its own natural resources and to enact and enforce its own laws. That injury, the State argues, is directly and solely caused by the listing and a judgment vacating the listing will redress the injury. Finally, with respect to prudential standing, the State contends that its grievance falls within the ESA's zone of interests.

Like the Maine Businesses, the State has failed to provide evidentiary support for the facts necessary for it to establish standing. Nevertheless, the importance of the issues raised in this case persuades the Court to apply the doctrine of judicial notice to determine whether the State of Maine has standing to challenge the listing decision. *See* FED. R. EVID. 201 (doctrine of "judicial notice" permits court to consider generally accepted or readily verified fact as proved without requiring evidence to establish it); FED. R. EVID. 201(f) (authorizes court to take judicial notice of adjudicative facts "at any stage of a proceeding"). A judicially noticed fact must be one not subject to reasonable dispute; such a fact must be capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. *See* FED. R. EVID. 201(b).

#### 1. Constitutional Standing

■ A state has been injured when the action it seeks to challenge injures one

of the state's sovereign interests. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico,* 458 U.S. 592, 601, 102 S.Ct. 3260, 3265, 73 L.Ed.2d 995 (1982). The State suggests that two sovereign interests are relevant in this case: first, the State's sovereign interest in managing and regulating their wildlife and other natural resources found within its borders, *see Minnesota v. Mille Lacs Band of Chippewa Indians,* 526 U.S. 172, 204, 119 S.Ct. 1187, 1204, 143 L.Ed.2d 270 (1999); *In re Steuart Transportation Co.,* 495 F.Supp. 38, 40 (E.D.Va.1980); *Maine v. M/V Tamano,* 357 F.Supp. 1097, 1100 (D.Me.1973), and second, the State's sovereign interest in enacting and enforcing its own legal codes. *See Alfred L. Snapp & Son, Inc.,* 458 U.S. at 601, 102 S.Ct. at 3265; *Maine v. Taylor,* 477 U.S. 131, 137, 106 S.Ct. 2440, 2446, 91 L.Ed.2d 110 (1986); *Texas Office of Pub. Util. Counsel v. FCC,* 183 F.3d 393, 449 (5th Cir.1999). Federal interference with this sovereign interest is sufficient to confer standing. *See Illinois Dep't of Transportation v. Hinson,* 122 F.3d 370, 372 (7th Cir.1997); *Oregon v. Ashcroft,* 192 F.Supp.2d 1077, 1087 (D.Or. 2002); *Alabama v. Bowsher,* 734 F.Supp. 525, 536 (D.D.C.1990).

The State argues that the ESA listing of Atlantic Salmon injures both of these sovereign interests of the State because it essentially nullifies any State law or regulation that permits an activity that, under the ESA, would be considered a "take" of Atlantic Salmon. This is also true by virtue of the supremacy clause of the United States Constitution, U.S. CONST. art. VI, cl. 2, which invalidates state laws that interfere with, or are contrary to, federal law, and by virtue of the ESA's own preemption provision, 16 U.S.C. § 1535(f). The State asserts that the ESA listing interferes with Maine's interests in managing its own natural resources and in enacting and enforcing its own legal code relat-

ing to the State's regulation of recreational and commercial fishing. *See, e.g.,* 12 M.R.S.A. §§ 6501–6575–F, § 7035, §§ 7551–7630; § 9902 (Department of Inland Fisheries and Wildlife, Department of Maine Resources, and Atlantic Salmon Commission regulating both inland and marine waters). The State's legislature either directly regulates the extent to which persons may fish in waters within the State's jurisdiction or commits to various executive departments the power to determine the extent to which such fishing may take place. The ESA listing of Atlantic salmon prohibits the State from exercising its sovereign power to determine the extent to which persons may fish for Atlantic salmon. The State also argues that the listing will interfere with the State's sovereign interests in other ways by declaring that certain activities may constitute an unlawful "take" of Atlantic salmon; for example, the State's regulation of aquaculture operations and the State's regulation of various activities within waterways, including dredging, bulldozing, displacing soil, and discharging pollutants, 38 M.R.S.A. §§ 413, 480–C.

The State of Maine and its sovereign interests involved in the listing is not a matter of dispute, and the Court will take judicial notice of those facts. *See Massachusetts v. Westcott,* 431 U.S. 322, 323 n. 2, 97 S.Ct. 1755, 1756, 52 L.Ed.2d 349 (1977) (per curiam) (taking judicial notice of fishery licenses as reflected in the records of the Coast Guard's Merchant Vessel Documentation Division); *Lussier v. Runyon,* 50 F.3d 1103, 1114 (1st Cir.1995). The State has clearly established the first element of standing—that the listing injures the State by interfering with its sovereign interests in managing its own natural resources and enacting and enforcing its own legal code. The other two elements of constitutional standing are also easily sat-

isfied. The State's injury is obviously causally connected to the Services' listing decision, and the injury would be redressed by a favorable judgment vacating the listing decision. The Court, therefore, concludes that the State has constitutional standing to bring this suit.

### 2. Zone of Interests

 The judicial review provision of the APA, 5 U.S.C. § 702, imposes a prudential standing requirement in addition to the requirement imposed by Article III of the Constitution, that a plaintiff must have suffered a sufficient injury-in-fact. *See National Credit Union Admin. v. First Nat. Bank & Trust Co.*, 522 U.S. 479, 488, 118 S.Ct. 927, 933, 140 L.Ed.2d 1 (1998). For a plaintiff to have prudential standing under the APA, the interest sought to be protected by the plaintiff must be arguably within the zone of interests to be protected or regulated by the statute in question. *Bennett*, 520 U.S. at 175, 117 S.Ct. at 1167. The Court also finds that the State satisfies the "zone of interest" test for standing.

 In a suit such as this one, where a plaintiff is seeking review under the APA of the agencies' implementation of the ESA, one looks "to the substantive provisions of the ESA, the alleged violations of which serve as the gravamen of the complaint." *Id.* As discussed above, the State is the subject of the contested regulatory action inasmuch as the ESA listing seeks to regulate a natural resource found within the State's borders. The ESA's overarching purpose is "species preservation," *id.*, and the State shares this interest. *See* 12 M.R.S.A. §§ 7751–7760 (State's legislation seeking to conserve and protect wildlife and the ecosystems upon which they depend). Finally, the provision of the ESA that governs listing decisions and the provision the State contends has been violated—16 U.S.C. § 1533—reflects a respect for states' sovereignty. *See* 16 U.S.C. § 1533(b)(1)(A) (requiring the Services, in making a listing decision, to take into account conservation efforts being made by any state government); 16 U.S.C. § 1533(b)(1)(B)(ii) (the Services must give consideration to any species that has been "identified as in danger of extinction, or likely to become so within the foreseeable future, by any state agency"); 16 U.S.C. § 1533(i) (Services must submit to the state agency "a written justification for [their] failure to adopt regulations consistent with the [state] agency's comments"); 16 U.S.C. § 1533(b)(5)(A)(ii)(notice of any proposed listing must be given to "each State in which the species is believed to occur"). Inasmuch as the State is alleging injuries to its sovereign interests, it falls within the "zone of interests" encompassed by the ESA.

### 3. Statutory Standing

 Defendants argue that the State has brought a citizen suit claiming that the Services failed to perform nondiscretionary acts under section 4 of the ESA. Defendants argue that Plaintiffs' section 4 claims should be dismissed for lack of subject matter jurisdiction because the State has not submitted to the Services the statutorily imposed sixty-day notice of their intent to sue. *See* 16 U.S.C. § 1540(g)(2)(C) ("No action may be commenced … prior to sixty days after written notice has been given to the Secretary."). Specifically, Defendants argue that the State, in claim 5 of its Complaint, alleges that the Services failed to make their listing determination on the basis of the "best available scientific and commercial data." In addition, Defendants assert that the State, in claim 7 of its Complaint, alleges that the Services failed to provide a summary showing the relationship of the data relied upon to the final listing rule as

required by 16 U.S.C. § 1533(b)(8). These claims, Defendants assert, allege a violation of a nondiscretionary duty, reviewable only under the citizen suit provision, and require the sixty-day notice. The State responds that the Services' argument should be rejected because its claims are brought pursuant to the APA, not the ESA, which requires no notice in advance of filing a lawsuit. The State does not bring this action under the citizen suit provision of the ESA because the State is challenging a discretionary action of the Services, and the citizen suit provision permits only challenges to nondiscretionary actions. *See* 16 U.S.C. §§ 1540(g)(1)(C) and 1540(g)(2)(C). The two claims made by the State that the Services allege are brought under the ESA are that in issuing the final rule listing Atlantic Salmon (1) the Services failed to provide a summary of the data on which the rule was based and showing the relationship of such data to the rule, as required by 16 U.S.C. § 1533(b)(8); and (2) that the Services failed to make their listing determination solely on the basis of the best available scientific and commercial data as required by 16 U.S.C. § 1533(b)(1)(A). In its brief, the State abandons its first claim for the summary of the data. *See* Plaintiff State of Maine's Reply in Support of its Motion for Summary Judgment (Docket Item No. 81) at 10. The second claim, the State argues, is properly presented as part of its APA claim because it relates only to the State's argument that in making their listing decision, the Services unlawfully considered litigation concerns rather than limiting their review to the best scientific and commercial data.

If a remedy exists under the ESA, action under the APA is not allowed. *See Bennett,* 520 U.S. at 161–62, 117 S.Ct. at 1160–61. The Court concludes that the remaining claim relates to the overall listing decision and, as such, challenges "an exercise of discretion" and is thus "subject to judicial review under the APA—not the ESA." *Federation of Fly Fishers v. Daley,* 200 F.Supp.2d 1181, 1185–86 (N.D.Cal. 2002). Listing decisions involve the exercise of some discretion, and challenges to such decisions that allege an abuse of that discretion cannot be brought under the ESA's citizen suit provision, which applies only to the performance of nondiscretionary duties. *See* 16 U.S.C. § 1540(g)(1)(C). Although the Services' discretion is limited inasmuch as they are required to consider only certain factors, 16 U.S.C. § 1533(a) and (b), the decision can be reversed only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706.

## II. Facial Challenge to the Joint DPS Policy

As stated above, in order to consider a "species" for listing under the ESA, the Services must identify a species, subspecies, or "distinct population segment"— DPS. 16 U.S.C. § 1532(16). Congress did not define the term "distinct population segment" and, as the Services have noted, the term is not commonly used in scientific discourse. 61 Fed.Reg. 4722, reproduced at DPS Policy AR at 44. Similarly, the term "population," which refers to some group of individuals of the same taxon, is subject to many interpretations. DPS Policy AR Ref. Doc. 7, at 56 (National Research Council Report on Science and the Endangered Species Act) (noting that below the subspecies level, evolutionary units "exist along a continuum[.][I]t is a policy judgment as well as a science judgment to determine the significance of an evolutionary unit."). The Services published their Policy Regarding Recognition of Distinct Vertebrate Population Segments Under the ESA ("Joint DPS Policy") on February 7, 1996, after notice and comment. 61

Fed.Reg. 4721, reproduced at DPS Policy AR 636.

The State claims that the Services' interpretation of the term "distinct population segment" is unlawful and expands the definition of "species" beyond that intended by Congress. *See* Plaintiff State of Maine's Motion for Summary Judgment (Docket Item No. 62) at 13–24. Specifically, the State contends that the 1996 Joint DPS Policy is unlawful because it permits the DPS determination to be made based solely on international boundaries and other geographical considerations. Relying, in part, on the statutory evolution of the term "distinct population segment," the State asserts that as originally enacted, the ESA defined "species" to include groups of animals "in common spatial arrangement that interbreed when mature." Pub.L. No. 93–205, 87 Stat. 884 (Dec. 28, 1973). In 1978, the State points out that, Congress amended the definition of species by removing the "in common spatial arrangement" language and, instead, defined "species" as including "any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. § 1532(16). This amendment, the State argues, constitutes persuasive evidence that Congress intended to preclude geography from being used as the sole basis for determining that a population constitutes a "species" within the meaning of the ESA. The Services respond that the Court should uphold the Joint DPS Policy because it represents an reasonable interpretation of an indisputably ambiguous statutory term and is consistent with both the best scientific principles and the intent

of Congress. Defendant's Cross–Motion for Summary Judgment at 12.

## A. Development of the Services' DPS Policies

### 1. Early Efforts Toward a DPS Policy

After the ESA was amended to include the term "DPS," the question of how to treat populations in listing decisions and in other contexts arose and was the question of considerable discussion and internal debate within the Services. *See* DPS Policy AR at 14–17 (announcing policy under which a jeopardy finding could be made when the proposed action was likely to jeopardize a previously identified population segment of a listed species); DPS Policy AR 20 (noting, in the context of deliberations about listing the silver rice rat, the lack of a universally recognized and accepted basis for deciding to list individual populations). This is exemplified by the February 1990 briefing paper prepared for the Assistant Director of FWS, which notes that there had been "no concise statement of policy on the use of the term 'population' as allowed in the [ESA]," and that there was general agreement within FWS on the need for such a policy. DPS Policy AR 22. The briefing paper discussed major unresolved issues including, in particular, the extent to which political boundaries should be considered in identifying distinct population segments and the degree of "distinctness" as well as the methodology that should be required to make a population eligible for listing.[9] *Id.* at 22, 23. The briefing paper also noted "considerable disagreement" over how much of a species' original range must have been in the United States. "Many vertebrates reach their 'northernmost' or

---

9. With respect to the question of political boundaries, the briefing paper noted that some FWS regions advocated the use of political boundaries "regardless of their significance to the biology of the species in ques- tion," while others argued that "such boundaries are usually very artificial and should only be used when they closely approximate natural boundaries separating adjacent populations." DPS Policy AR 22.

'southernmost' limit of distribution at a U.S. border." *Id.* at 23. The briefing papers noted Congress's conflicting admonitions that the Services "should consider listing such species, but it also directed that the listing of such populations should be used sparingly." *Id.* The briefing paper concluded by recommending that a working group of FWS biologists, as well as a representative of NMFS, be convened to meet and "try to come to some consensus on how the Service should determine a population under the Act." *Id.*

In April 1990, FWS published in the Federal Register a Notice of Review regarding consideration of the silver rice rat, found in the lower Florida Keys, for listing as a vertebrate population. 55 Fed.Reg. 17648 (April 26, 1990), reproduced at DPS Policy AR 27. Although the silver rice rat had previously been identified as a species, subsequent taxonomic revision concluded that it did not merit designation as a species or subspecies and, as a result of a legal challenge, FWS was considering listing the silver rice rat as a "vertebrate population." *Id.* In addition, FWS solicited comments on "general standards that should be used to define vertebrate populations" under the ESA. *Id.*

A workshop was held in June 1990 to develop a working definition of the term "vertebrate population" as used in the ESA. DPS Policy AR 38–50 (minutes of meeting). Participants included eight biologists with backgrounds in genetics and population dynamics, as well as other related topics, and included members from FWS, NMFS, and academia. DPS Policy AR 90–91 (Draft Policy). The meeting included a wide-ranging discussion of the ways in which "distinct population segment" might be defined.[10] DPS Policy AR

40–45 (minutes). There was discussion of the role of genetics, *id.* at 39–40, during which it was recorded in the minutes that participants noted the importance of genetic diversity, the distinction between genetic diversity and clinal variation, and the difficulties of interpreting genetic data. *Id.* at 39–42. The concept of an evolutionarily significant unit ("ESU") also was discussed. *Id.* at 42. Panel members also discussed the appropriateness of "recognizing the benefit of listing population units to protect ecosystems." *Id.* at 42; *see also id.* at 41 ("May need ability to preserve ecosystems."). Ultimately, the panel "expressed a range of views" on the definition of populations, from "flexible" to "absolute." *Id.* at 44. Although genetic data provide one option for identifying differences among populations, it was agreed that such data was not the only option. *See* DPS Policy AR 46–49. Moreover, since the inclusion of the term "DPS" in the ESA, DNA technologies have developed and continue to improve. *See* DPS Policy AR 322; *see also* DPS Policy AR 93 ("The science of DNA interpretation is young. As in any new field of research, some of the basic assumptions underlying interpretations may later be disproved or refined."). Other methods for identifying differences among populations include morphological data. DPS Policy AR 47, 79; *see also* 61 Fed.Reg. at 4725, reproduced at DPS Policy AR 640. One research paper states that molecular genetic data are not necessarily better than morphological data "for classification of populations and subspecies for conservation or management programs." DPS AR 79. "[M]orphology may reflect local adaptation—or local environmental conditions, and may actually be better for identifica-

---

10. For example, one participant remarked that there might be "[f]our ways of defining populations—distribution/geography, popula- tion/behavioral responses; morphological differences; genetics." DPS Policy AR 42.

tion of characteristics worth conserving through management programs." *Id.; see also id.* at 78–79 (discussing problems and strengths of both molecular and morphological approaches to subspecies designation).

Subsequent to the June 1990 workshop, a draft proposed rule was prepared that would have amended the regulations for listing, delisting, and reclassifying species under the ESA by defining the term "vertebrate population." DPS Policy AR 88 ("Draft Vertebrate Population Rule"). The Background section of the draft rule presented a summary of the major points discussed at the workshop. *Id.* at 91. Based on the information reviewed at the workshop, the Draft Vertebrate Population Rule "recognized the disagreement about the degree and methodology to be used to determine how distinct a population must be to be eligible for listing." DPS Policy AR 92. Techniques available to separate species, subspecies, and populations from one another may vary with the group of animals in question. *Id.* Morphological (*e.g.*, size, shape, and color), behavioral (*e.g.*, reproductive behavior), and biochemical (*e.g.*, genetic analysis of proteins) differences are commonly used to analyze classic taxonomic separations, and each of these methods has its limitations. *See id.* at 92–93.

At that time, the Services recognized the centrality of the concept of isolation to the protection of populations under the Act. In the proposed rule, FWS explained:

> Some populations show a high degree of isolation from other members of the same subspecies or species. The limitations on gene flow created by this isolation could have the long-term effect of allowing a certain degree of genetic distance to form between the population and other members of the same taxon.

Local mutations that favor the population in the isolated portion of its range may develop and survive in that population alone.

*Id.* at 110–11. Isolation may be the result of biogeographic pressures that tend to limit gene flow, and such pressures may be enhanced by human activities. *Id.* at 111. Complete isolation is neither expected nor desired. *See* DPS Policy AR Ref. Doc. 17, at 13 (noting that "anadromous spawning populations that are completely isolated from other nonspecific populations are probably rare"). The Services also considered that "[e]xtinction of a biological unit is irreversible because it involves the permanent loss of genetic resources capable of regenerating that unit." DPS Policy AR Ref. Doc. 20, at 21. Moreover, neighboring populations would not be expected to re-establish the taxon in the vacated range within a reasonable number of generations. DPS Policy AR 122; DPS Policy AR Ref. Doc. 20, at 21. Ultimately, the policy set forth in the Draft Vertebrate Population Rule was not published as a proposed rule nor was it adopted as agency policy. *See* 57 Fed.Reg. 51472 (November 3, 1992) (noting that agenda item was "withdrawn").

### 2. Pacific Salmon DPS

Although after the addition of the term "distinct population segment" to the ESA in 1978—both FWS and NMFS made listing determinations for populations of vertebrate species—it was not until 1991 that either Service established criteria for determining what qualifies as a DPS. While the Services collaborated on a joint policy, NMFS received five petitions in 1989 and 1990 to list Pacific salmon populations under the ESA. 56 Fed.Reg. 58612, reproduced at DPS Policy AR 171. Prompted

by those petitions, NMFS [11] published first an Interim Policy on Applying the Definition of Species Under the Endangered Species Act to Pacific Salmon, 56 Fed.Reg. 10542 (March 13, 1991), and then a final policy on the same subject.[12] 56 Fed.Reg. 58612 (Nov. 20, 1991), reproduced at DPS Policy AR 171 ("Pacific Salmon DPS Policy"); *see also* DPS Policy AR Ref. Doc. 21, at 420.

In announcing its policy, NMFS pointed out that Congress, by not explaining how "distinctness" should be measured, provided limited guidance for interpreting the definition of "species." 56 Fed.Reg. at 58613, reproduced at DPS Policy AR 172. Expressing the view that "distinctness," as it pertains to the ESA, "is an evolutionary attribute of a population," 56 Fed.Reg. at 58617–18, reproduced at DPS Policy AR 176–77, NMFS announced that a stock of Pacific salmon will be considered a distinct population, and, hence, a "species" under the ESA, if it represents an "evolutionarily significant unit" ("ESU") of the biological species. 56 Fed.Reg. at 58618, reproduced at DPS Policy AR at 177. Under the Pacific Salmon DPS Policy, a stock of Pacific salmon is considered a distinct population segment for the purposes of the ESA if it represents an evolutionarily significant unit of the biological species. A stock is considered an ESU if it meets both of the following criteria: (1) it is substantially reproductively isolated from other conspecific population units; and (2) it represents an important component of the evolutionary legacy of the species. *Id.* In response

to a comment on the role of genetic data, NMFS stated that

> to be considered an ESU, a population must be genetically distinct from other conspecific populations—because population characteristics that are evolutionarily significant must have a genetic basis. This does not mean, however, that the genetic differences must be (or can be, in every case) detected by any particular analytical technique. Thus, NMFS agrees that a lack of direct genetic information does not preclude consideration of a population as an ESU. However if no direct genetic information is available, evidence to support an ESU must be found elsewhere, which inescapably places a greater burden of proof on other characteristics.

56 Fed.Reg. at 58616, reproduced at DPS Policy AR 175. In the Pacific Salmon DPS Policy, NMFS noted that a committee of Congress had admonished its sister agency, FWS, to employ the DPS authority sparingly:

> In 1979, Congress declined to enact a provision recommended by the General Accounting Office that would have removed the authority to list vertebrate populations. The Senate Report to the 1979 amendments, however, stated that "the committee is aware of the great potential for abuse of this authority and expects the FWS to use the ability to list populations sparingly and only when biological evidence indicates that such action is warranted."

11. In discussing the development and implementation of the Pacific Salmon DPS, the Services refer to NOAA as the division within the Department of Commerce that was responsible for the Pacific Salmon DPS. The Federal Register indicates that it was NMFS that developed and implemented the Pacific Salmon DPS. The reason for this attempted distinction in the record is unexplained.

However, relying on the Federal Register, the Court will refer to NMFS when discussing what organization developed the Pacific Salmon DPS Policy.

12. The Pacific Salmon DPS Policy was based on a technical memorandum authored by Dr. Robin S. Waples, a NMFS scientist. DPS Policy AR Ref. Doc. 17.

56 Fed.Reg. 58612 (quoting S.Rep. No. 151 (1979)), reproduced at DPS Policy AR 171. At that time, NMFS also concluded that population "distinctness" should be supported by "positive scientific evidence." 56 Fed.Reg. 58617, reproduced at DPS Policy AR 176.

### 3. Joint DPS Policy Applicable to All Vertebrates

Subsequent to the publication of the Pacific Salmon DPS Policy, the Services continued to consider the larger question addressing a DPS policy applicable to all vertebrate populations. *See, e.g.,* DPS Policy AR 159 (considering concept of populations in context of goals for delisting grizzly bear); DPS Policy AR 178 (discussing whether fluvial river-dwelling Arctic grayling should be listed as a population, and noting drawbacks of listing based on "subtle genetic differences" while advocating listing decisions be made "on the basis of geography or population"); DPS Policy AR 185 (discussing whether Alaska breeding population of Steller's eider meets the definition of "population segment"); *id.* at 202 (same). The general conceptual approach requiring both distinctness (later termed discreteness) and significance was by now generally accepted. DPS Policy AR 215 (Briefing Statement for Secretary of Interior (March 1, 1994)). Several issues, however, remained to be worked out between the Services. First, the Services had conceptual differences about whether the distinctness and significance inquiries were sequential steps or independent criteria. *See* DPS Policy AR 215, 217, 219, 220. Second, the Services disagreed as to whether to permit distinctness to be based upon international boundaries. DPS Poli-

cy AR 219. Third, the Services had not resolved between them whether the new policy would apply to Pacific salmon. DPS Policy AR 223. With respect to the latter two points, FWS generally preferred a [somewhat different] broader, more flexible policy to permit it "to address the greater diversity of biological situations presented by the broader array of vertebrate groups to which [FWS] must apply its criteria." *Id.* at 213. The FWS's "approach places less emphasis on genetic uniqueness and does not necessarily imply that the observed unique characteristics are either adaptive or have a genetic basis." *Id.*

Throughout the development of the Joint DPS Policy, there was discussion and criticism, both from within and outside the Services, as to whether geographical or political boundaries are appropriate considerations in identifying a DPS. *See* DPS Policy AR 322–23, 335, 337, 599, 660, 662, 983, 985, 986, 987, 992–95, 1002; DPS Policy AR Ref. Doc. 7, at 58, 65. In May 1994, a symposium sponsored by the American Fisheries Society was held in Monterey, California, on Evolution and the Aquatic Ecosystem: Defining Unique Units in Population Conservation ("Monterey Symposium"). DPS Policy AR Ref. Doc. 19. At the symposium, a FWS official presented a paper describing a proposed DPS policy. DPS Policy AR Ref. Doc. 22. The proposed policy, which is similar to the final 1996 DPS Policy that ultimately was adopted, set forth a "stepwise" approach that would require the Services "first to consider the distinctness of the population under consideration and then to assess its significance."[13] *Id.* at 423. Other papers

---

13. Distinctness could be satisfied if either (a) the population segment was markedly separated from other populations of the same taxon as a consequence of physical, physiological, ecological, or behavioral factors; or (b) if the population segment is delineated by international boundaries within which there are differences in control or exploitation, management of habitat, conservation status, or regulatory mechanisms. *See* DPS Policy AR

presented at the Monterey Symposium included a presentation by Dr. Robin Wapoles entitled "Evolutionary Significant Units and the Conservation of Biological Diversity Under the Endangered Species Act." DPS Policy AR Ref. Doc. 20. In that paper, Dr. Wapoles reviewed the application of the Pacific Salmon DPS Policy in ESA status reviews of Pacific salmon populations, *id.* at 10–20, and addressed criticisms of the ESU concept and the application of the Pacific Salmon Policy. *Id.* at 20–25.

On December 21, 1994, the Services published their draft policy regarding the interpretation of "distinct population segments" under the ESA, and solicited comments on the proposed policy. 59 Fed. Reg. 65884 (Dec. 21, 1994), reproduced at DPS Policy AR 225. The draft policy was similar but not identical to the policy discussed at the Monterey Symposium. It included three elements that would be considered in a decision regarding the status of a possible distinct population segment as endangered or threatened under the ESA: (1) discreteness of the population segment in relation to the remainder of the species to which it belongs; (2) significance of the population segment to the species; and (3) the population segment's conservation status in relation to the ESA's standards for listing. *Id.* The Ser-

vices received thirty-one letters from individuals and organizations commenting on the draft policy. 61 Fed.Reg. 4722, reproduced at DPS Policy AR 637. While commentators expressed a range of opinions, it was generally believed that the application of the Joint DPS Policy and the Pacific Salmon DPS Policy would lead to consistent results.[14] DPS Policy AR 238; *see also* DPS Policy Ref. Doc. 20, at 25; *id.* Ref. Doc. 7, at 58; 61 Fed.Reg. at 4722, reproduced at DPS Policy AR 637; DPS Policy AR 616, 632. However, the second criterion in the draft FWS policy, which refers to international political boundaries, has no analogue in the NMFS policy. *See* DPS Policy AR 985.

In 1995, the National Research Council ("NRC") published a report entitled Science and the Endangered Species Act. DPS Policy AR Ref. Doc. 7. Among other things, the report examined the definition of species under the ESA. *Id.* at 56–67. Noting that because below the subspecies level, evolutionary units "exist along a continuum, it is a policy judgment as well as a science judgment to determine the significance of an evolutionary unit." *Id.* at 56. The NRC endorsed the use of scientifically identified evolutionary units ("EU") to identify distinct population segments for conservation purposes. *Id.* at 57, 67. The

---

Ref. Doc. 21 at 423–24. Significance could be satisfied by, among other factors, (a) persistence in an unusual or unique ecological setting; (b) evidence that the population's loss would leave a significant gap in the range of the species; (c) evidence that it represents the only surviving natural occurrence of a species; or (d) evidence that it differs markedly from other populations in its genetic characteristics. *Id.* at 424.

**14.** For example, a FWS biologist stated that the draft joint policy was "consistent with the rationale for an evolutionary significant unit (ESU) of ... [NMFS'] definition of a distinct population segment to be applied to Pacific salmon species." DPS Policy AR 213. Simi-

larly, Robin Waples, the NMFS biologist whose paper was the basis for the Pacific Salmon DPS Policy, concluded that "[r]oughly speaking, 'discreteness' corresponds to 'reproductive isolation' in the NMFS policy, and 'significance' corresponds to 'evolutionary legacy' or 'substantial contribution to ecological/genetic diversity.'" DPS Policy AR 222. The Services generally believed that applying either policy would lead to similar results in particular cases. *See id.* at 222 (NOAA Fisheries: Robin Waples comparing policies); *id.* at 213 (FWS: "Listable distinct population segments will usually satisfy both [FWS] and NMFS criteria.").

NRC distinguished evolutionary units from ESUs as the latter concept is employed in the Pacific Salmon DPS Policy, noting that the evolutionary unit places less stress on reproductive isolation and recognizes that significance exists along a continuum. *Id.* at 57 n. 2. Nonetheless, the NRC stated "it seems likely that the application of either the EU or the ESU concept would lead to similar results most of the time, especially for vertebrates." *Id.* With respect to the delineation of an EU on the basis of political boundaries, the NRC stated "[a]lthough there can be good policy reasons for such delineations, there are not sound scientific reasons to delineate species only in accordance with political boundaries." *Id.* at 58.

On February 7, 1996, the Services issued the "Policy Regarding the Recognition of Distinct Vertebrate Population Segments under the Endangered Species Act" ("Joint DPS Policy"). *See* 61 Fed.Reg. 4722, reproduced at DPS Policy AR 637. The Services issued a joint policy to "clarify their interpretation of the phrase 'distinct population segment,' " as it relates to all vertebrates, as opposed to the Pacific Salmon DPS Policy, which was limited to Pacific salmon stocks. *Id.* Meeting minutes indicate that one issue to be addressed in developing the DPS policy was "the use of political boundaries to make determinations on vertebrate population, regardless of their significance to the biology of the species." DPS Policy AR 038. The minutes go on to state that FWS "has listed populations based on political boundaries in the past." *Id.* In fact, prior to 1996, at least two dozen vertebrate populations were defined solely upon political boundaries. DPS Policy AR 091.

### B. Lawfulness of the Joint DPS Policy

The State contends that the Services' listing decision should be set aside because it is premised on an unlawful interpretation of the term "distinct population segment." Specifically, the State contends that the Services' interpretation of "DPS" is based solely on international boundaries and other geographical considerations and, as such, the interpretation is broader than Congress intended. In addition, when considering the lawfulness of the Joint DPS Policy, the State argues that the Services' interpretation of "distinct population segment" should be accorded little or no deference because the policy is not the result of formal rulemaking and because protection and management of wildlife is a traditional state power. *See* Plaintiff State of Maine's Motion for Summary Judgment at 24 n. 16. The Services disagree with the State on both points, arguing that their policy is not based on unlawful criteria and that the Joint DPS Policy is entitled to the level of deference set forth in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

The Supreme Court has recently delineated levels of judicial deference owed to actions taken by administrative agencies in *United States v. Mead,* 533 U.S. 218, 236–37, 121 S.Ct. 2164, 2176, 150 L.Ed.2d 292 (2001). The *Mead* Court held that *Chevron* deference is mandatory when Congress has expressly or implicitly indicated that it intended the agency to speak with the force of law on a matter and the agency's position on that matter is reasonable. *Id.* at 229, 121 S.Ct. at 2171–72. The Court explained that

administrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that au-

thority. Delegation of such authority may be shown in a variety of ways, as by an agency's power to engage in adjudication or notice-and-comment rulemaking, or by some other indication of a comparable congressional intent. *Id.* at 226–27, 121 S.Ct. at 2171. Continuing to outline the range of deference, the Court confirmed its holding in *Skidmore v. Swift & Co.,* 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944), that "an agency's interpretation may merit some deference whatever its form, given the 'specialized experience and broader investigations and information' available to the agency." *Id.* at 234, 121 S.Ct. at 2175 (quoting *Skidmore,* 323 U.S. at 139, 65 S.Ct. 161, 89 L.Ed. 124). The Court instructed that determining whether *Skidmore* deference is owed turns on the " 'thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade.' " *Id.* at 228, 121 S.Ct. at 2172 (quoting *Skidmore,* 323 U.S. at 140, 65 S.Ct. 161, 89 L.Ed. 124). Generally, pursuant to *Skidmore* deference, an agency's position may be accorded respect depending on its persuasiveness. *See id.* at 235–36, 121 S.Ct. at 2175–76.

### 1. *Chevron* Applicability

 Pursuant to *Mead,* in order to determine what level of deference is due the Joint DPS Policy, the Court must first ask whether "Congress delegated authority to the agency generally [to make such determinations] carrying the force of law," and whether "the agency interpretation claiming deference was promulgated in the exercise of that authority." *Mead,* 533 U.S. at 226–27, 121 S.Ct. at 2171. At the outset, the Court notes "Congress delegated broad administrative and interpretive powers to the Secretary [of the Interior and the Secretary of Commerce]"

when it enacted the ESA. *See Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,* 515 U.S. 687, 708, 115 S.Ct. 2407, 2418, 132 L.Ed.2d 597 (1995) (citing 16 U.S.C. §§ 1533, 1540(f)). When Congress has entrusted this type of broad discretion, courts should be hesitant to substitute their views of wise policy for the agencies' views. *See id.* (citing *Chevron,* 467 U.S. at 865–66, 104 S.Ct. at 2793). As a specific delegation of authority to establish criteria for making findings on petitions to list species as threatened or endangered, the Services rely on the provision of the ESA which provides for publication of "guidelines to insure that the purposes of this section are achieved efficiently and effectively." *See* 16 U.S.C. § 1533(h)(2) (providing for publication of guidelines after notice and comment).

The State also argues that *Chevron* deference is not applicable because the Joint DPS Policy "alters the federal-state framework by permitting federal encroachment upon a traditional state power." Plaintiff State of Maine's Motion for Summary Judgment (Docket Item No. 62) at 24 n. 16 (quoting *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers,* 531 U.S. 159, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001)) ("*Solid Waste* "). In *Solid Waste* the issue before the Court was whether the Army Corps of Engineers ("Army Corps") had exceeded its jurisdiction under the Clean Water Act ("CWA") by defining navigable waters/waters of the United States to include isolated wetlands that are or could be used by migratory birds or endangered species. *See id.* at 162–64, 121 S.Ct. at 678. The Supreme Court held that the Army Corps' "Migratory Bird Rule" was unenforceable because it exceeded the authority granted to the Corps under the CWA. *Id.* at 174, 121 S.Ct. at 684. The Court decided that where an administrative interpretation of a

statute invokes the outer limits of Congress's power, the agency must establish a clear indication that Congress intended to alter the federal-state framework by permitting federal encroachment upon a traditional state power. *Id.* at 172, 531 U.S. 159, 121 S.Ct. 675, 148 L.Ed.2d 576 (citing *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Constr. Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988)). The Court declined to confer *Chevron* deference on the Army Corps' interpretation in favor of the well-established principle that the Court will reject "an otherwise acceptable construction of a statute" in order to avoid "serious constitutional problems." *Id.* at 173, 121 S.Ct. 675.

This case is distinguishable from *Solid Waste.* While Maine, like other states, has a significant role in the management of its resident wildlife, its authority in this area is shared with the federal government. *See Mille Lacs Band of Chippewa Indians,* 526 U.S. at 204, 119 S.Ct. 1187 ("Although States have important interests in regulating wildlife and natural resources within their borders, this authority is shared with the Federal Government when the Federal Government exercises one of its enumerated constitutional powers . . . ."); *see also GDF Realty Investments, Ltd. v. Norton,* 169 F.Supp.2d 648, 663 (S.D.Tex.2001) (citing examples). In contrast to the regulatory interpretation at issue in *Solid Waste,* the Joint DPS Policy does not alter the federal-state framework any more than Congress already has done through the ESA. Both the federal and state governments have a common interest in the preservation of Atlantic salmon.

The Joint DPS Policy was issued as an official position of the agencies after both the proposed and final versions of the policy were published in the Federal Register and the policy was subject to public notice and comment. *See* 59 Fed.Reg. 65884 (December 21, 1994), reproduced at DPS Policy AR 224; 61 Fed.Reg. 4722, reproduced at DPS Policy AR 637. As stated in the facts surrounding the development and implementation of the Joint DPS Policy, the Joint DPS Policy evolved over a number of years as the Services deliberated a variety of significant issues and the policy went through successive iterations. Under these circumstances, *Mead* dictates that the Joint DPS Policy be considered under the *Chevron* standard. *See Federal Election Commission v. National Rifle Ass'n,* 254 F.3d 173, 184–86 (D.C.Cir.2001) (conferring *Chevron* deference on FEC advisory opinions developed through a public process, pursuant to statutorily granted authority).

■■■ The first step of the *Chevron* inquiry requires the Court to determine whether Congress has "directly spoken to the precise question at issue." *Chevron,* 467 U.S. at 842, 104 S.Ct. 2778. In this case, the parties agree that the term "distinct population segment" is not specifically defined in the ESA and that the legislative history does not prescribe a precise meaning of the term. The statute being ambiguous, the Court must determine whether the agencies' interpretation is a "permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778. That a court owes deference to an agency's policy does not mean that the agency has unbridled discretion in creating and implementing policy. Agencies must comply with their own procedural rules and the policy selected by the agency must be reasonable in light of the statutory scheme. *Chevron,* 467 U.S. at 844, 104 S.Ct. at 2782. To this end, courts retain authority to check agency policymaking for procedural compliance and arbitrariness. But courts cannot engage in reexamining the wisdom of an agency-promulgated policy. The Court

will reverse the policy only if the agencies' construction is "arbitrary, capricious or manifestly contrary to the statute." *Id.* at 844, 104 S.Ct. 2778; *see also Texas Office of Pub. Util. Counsel v. FCC,* 183 F.3d 393, 409–10 (5th Cir.1999) (noting that "arbitrary and capricious review" under the APA differs from *Chevron* review in that the former focuses on the reasonableness of the agency's decision-making process rather than the reasonableness of its interpretation). With the appropriate standard of review in mind, the Court turns to the merits of the State's challenge to the Joint DPS Policy.

## 2. Joint DPS Policy is a Reasonable Construction of Ambiguous Statutory Language

 The Joint DPS Policy employs a three-part analysis to determine the status of a possible DPS as endangered or threatened under the ESA: discreteness of the population segment, its separateness, and its conservation status. *See* 61 Fed.Reg. at 4725, reproduced at DPS Policy AR 640. The Joint DPS Policy provides:

Three elements are considered in a decision regarding the status of a possible DPS as endangered or threatened under the Act. These are applied similarly for addition to the lists of endangered and threatened wildlife and plants, reclassification, and removal from the lists:

1. Discreteness of the population segment in relation to the remainder of the species to which it belongs;

2. The significance of the population segment to the species to which it belongs; and

3. The population segment's conservation status in relation to the Act's standards for listing (*i.e.,* is the population segment, when treated as if it were a species, endangered or threatened?).

Discreteness: A population segment of a vertebrate species may be considered discrete if it satisfies either one of the following conditions:

1. It is markedly separated from other populations of the same taxon as a consequence of physical, physiological, ecological, or behavioral factors. Quantitative measures of genetic or morphological discontinuity may provide evidence of this separation.

2. It is delimited by international governmental boundaries within which differences in control of exploitation, management of habitat, conservation status, or regulatory mechanisms exist that are significant in light of section 4(a)(1)(D) of the Act.

Significance: If a population segment is considered discrete under one or more of the above conditions, its biological and ecological significance will then be considered in light of Congressional guidance (see Senate Report 151, 96th Congress, 1st Session) that the authority to list DPS's be used " * * * sparingly" while encouraging the conservation of genetic diversity. In carrying out this examination, the Services will consider available scientific evidence of the discrete population segment's importance to the taxon to which it belongs. This consideration may include, but is not limited to, the following:

1. Persistence of the discrete population segment in an ecological setting unusual or unique for the taxon,

2. Evidence that loss of the discrete population segment would result in a significant gap in the range of a taxon,

3. Evidence that the discrete population segment represents the only surviving natural occurrence of a taxon that may be more abundant elsewhere as an introduced population outside its historic range, or

4. Evidence that the discrete population segment differs markedly from other populations of the species in its genetic characteristics.

The State insists that the Joint DPS Policy is unlawfully based on geography. The Services respond that under the Joint DPS Policy, a DPS may not be based "solely" on "geography." The Court finds that the Joint DPS Policy was a reasonable interpretation of ambiguous statutory language. Although the international boundary/geography is used to identify the population, given the post-identification process involved in the classifying a DPS, the Court finds that the Services' Joint DPS Policy is not based solely on geography. The State's effort to frame the issues of geography as being entirely separate from issues of genetics and adaptation runs counter to the fundamental principles of biology. Although these three factors can certainly be said to have geographic components, those same factors have biological and ecological components related to the preservation of genetic variability and unique local ecosystems. The Court will discuss the three factors which create the framework of the Joint DPS Policy below.

### a. Discreteness

Discreteness examines the extent to which the population in question is different from other populations of the same taxon.[15] *See* 61 Fed.Reg. at 4724, col. 2, reproduced at DPS Policy AR 639. Discreteness also ensures that a population given DPS status can be adequately defined and described. *Id.* A population will be considered discrete if it satisfies one of two conditions. First, the test for discreteness requires marked separation as a consequence of physical, physiological, ecological, or behavioral factors. This criterion examines biological discontinuity between the population segment in question and other representatives of the same taxon. The Services found that defining a population segment on the basis of isolation, and the resulting genetic variability it may represent, furthers the ESA's interrelated goals to conserve genetic resources and to maintain natural systems and biodiversity over a representative portion of their historic occurrence. *See* 61 Fed.Reg. 4723, DPS Policy AR 638.[16]

The second test for discreteness determines whether the population is "delimited by international boundaries within which there are differences in control of exploitation, management of habitat, or regulatory mechanisms ... that are significant in light of section 4(a)(1)(D) of the [ESA]." 61 Fed.Reg. at 4725, DPS Policy AR 640.[17] The State argues that using the international boundary to find discreteness and significance is an impermissible use of "geography" in contravention of the will of Congress. The use of international boundaries to delineate distinct population segments is consistent with congressional intent that we should not allow the United

---

**15.** The concept has also been referred to in the administrative record as "distinctness" or "distinctiveness."

**16.** The Services make it clear that discreteness, although serving the purpose of genetic diversity, is not established by genetic data. 61 Fed.Reg. at 4723, DPS Policy AR 638 (noting that neither the Joint DPS Policy nor the Pacific Salmon DPS Policy requires genetics data to identify a DPS). The Services contend that there are a number of analytical approaches available to examine a population's discreteness, and each is solidly founded in science and has a biological basis. The tools and data appropriate may vary with the species in question.

**17.** Section 4(a)(1)(D) examines the inadequacy of existing regulatory mechanisms to protect the species. *See* 16 U.S.C. § 1533(a)(1)(D).

States population of an animal to go extinct merely because it is more abundant elsewhere. Senate Report at 7, reproduced at DPS Policy AR 7. There must be—as there is here—significant differences across the border in terms of control of exploitation, management of habitat, or regulatory mechanisms. *See* 61 Fed.Reg. at 4725, reproduced at DPS Policy AR 640. Congress laid out this legal (rather than biological) inquiry as one of the factors that should be considered when determining whether to list a species under the ESA. *See* 16 U.S.C. § 1533(a)(1)(D). In addition, the population must also satisfy at least one of the criteria for significance under the DPS policy and face an assessment of its conservation status before it may be eligible for listing. Preserving U.S. populations is reasonable in the context of a national program to conserve species and their ecosystems. *See* 61 Fed. Reg. 4723, reproduced at DPS Policy AR 638.

### b. Significance

Significance recognizes that "populations commonly differ in their importance to the overall welfare of the species they represent." 61 Fed.Reg. at 4723, reproduced at DPS Policy AR 638. For this reason, the significance inquiry serves to implement Congress's intent that the DPS authority be used "sparingly." *See id.* Significance also concentrates conservation efforts on "avoiding important losses of genetic diversity." *Id.* at 4724, col. 3, DPS Policy AR 639. A population may be significant if (1) the discrete population has persisted in an ecological setting unusual or unique for the taxon, (2) there exists evidence that loss of discrete population segment would result in a significant gap in the range of the taxon, (3) there exists evidence that the discrete population segment represents the only surviving natural occurrence of a taxon that may be more abundant elsewhere as an introduced population outside its historic range, or (4) there exists evidence that the discrete population segment differs markedly from other populations of the species in its genetic characteristics. *See* 61 Fed.Reg. 4725, reproduced at DPS Policy AR 640.

Recognizing that deference is due to the agencies' development of the Joint DPS Policy, the Court is satisfied that the three factors identified by the Services in the significance inquiry have biological considerations as well as geographical ones. The importance of a population segment existing in an unusual or unique ecological setting is well established in the scientific literature; such a population segment is potentially an indication of local adaptations and, hence, genetic diversity. *See* 61 Fed Reg. 4724, reproduced at DPS Policy AR 639; *see also* DPS Policy Ref. Doc. 17 at 12; DPS Policy Ref. Doc. 7 at 67. Similarly, protecting a population segment where failure to do so would result in a significant gap in the taxon's range also gives effect to the significance criterion by preserving opportunities for gene flow and demographic stability. The last consideration gives effect to the fundamental concern underlying significance by conserving genetic resources. *See* 61 Fed Reg. 4723, reproduced at DPS Policy AR 638. Each of these nonexclusive considerations is a reasonable application of the significance criterion.

### c. Conservation Status

Finally, consideration of the population segment's conservation status provides a factual context for the Services to examine the ESA's factors to determine whether the population segment is endangered or threatened. *See* 61 Fed Reg. 4725, reproduced at DPS Policy AR 640.

### III. The Gulf of Maine DPS Listing Decision is Supported by the Record

 The Services' determination that the Gulf of Maine Atlantic salmon

population constitutes a DPS that warrants listing under the ESA should be reviewed under the "arbitrary and capricious" standard of the APA, 5 U.S.C. § 706. Under the APA, administrative decisions involving the ESA are upheld unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In exercising its narrowly defined duty under the APA, *Penobscot Air Services, Ltd. v. FAA*, 164 F.3d 713, 720 (1st Cir.1999), a court must consider whether the agency acted within the scope of its legal authority, whether the agency adequately explained its decision, whether the agency based its decision on facts in the record, and whether the agency considered the relevant factors. *See Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 1861–62, 104 L.Ed.2d 377 (1989); *Volpe*, 401 U.S. at 415–16, 91 S.Ct. at 823–24; *Professional Drivers Council v. Bureau of Motor Carrier Safety*, 706 F.2d 1216, 1220 (D.C.Cir. 1983).

 Under the ESA, the agency's action must be based on the "best scientific and commercial data available to [them] after conducting a review of the status of the species." 16 U.S.C. § 1533(b)(1)(A); *see also Southwest Center for Biological Diversity v. Babbitt*, 215 F.3d 58, 60 (D.C.Cir.2000) (finding no obligation under the ESA to conduct new research). The ESA, by adopting a standard of the "best scientific and commercial data available," and not a standard of absolute certainty, reflects Congress' intent that the agency take conservation measure before a species is " 'conclusively' headed for extinction." *Defenders of Wildlife v. Babbitt*, 958 F.Supp. 670, 680 (D.D.C.1997). When reviewing the scientific data included in the administrative record, the Court's inquiry is limited to whether the record supports the agency's findings and whether the agency's actions were based on the "best scientific . . . data available." This Court is not in a position to make policy judgments based on conflicting or uncertain scientific or technical data. "[W]here there are competing expert opinions, '[i]t is the prerogative of the agency to weigh those opinions and make a policy judgment based on the scientific data.' " *Brower v. Daley*, 93 F.Supp.2d 1071, 1082–83 (N.D.Cal.2000) (quoting *Southern Offshore Fishing Ass'n v. Daley*, 995 F.Supp. 1411, 1433 (M.D.Fla.1998)); *Marsh*, 490 U.S. at 378, 109 S.Ct. 1851. Even where there are competing expert opinions, or where the scientific data are equivocal, it is the agency's prerogative "to weigh those opinions and make a policy judgment based on the scientific data." *Brower v. Daley*, 93 F.Supp.2d 1071, 1082–83 (N.D.Cal.2000)(quoting *Southern Offshore Fishing Ass'n v. Daley*, 995 F.Supp. 1411, 1433 (M.D.Fla.1998). The court must defer to the agency's expertise, particularly with respect to decision-making which involves "a high level of technical expertise"). *Marsh*, 490 U.S. at 377, 109 S.Ct. at 1861; *Associated Fisheries of Maine, Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997).

 The deference a court must accord an agency's scientific or technical expertise is not unlimited, however. Thus the presumption of agency expertise may be rebutted if its decisions, even though based on scientific expertise, are not reasoned. *ALLTEL Corp. v. FCC*, 838 F.2d 551, 561–62 (D.C.Cir.1988). Where an agency fails "to articulate a rational connection between the facts found and the decision choice made," *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Company*, 463 U.S. 29, 52, 103 S.Ct. 2856, 2871, 77 L.Ed.2d 443 (1983), the Court " 'may not

supply a reasoned basis for the agency's action that the agency itself has not given.'" *Dithiocarbamate Task Force v. EPA,* 98 F.3d 1394, 1401 (D.C.Cir.1996) (quoting *Motor Vehicle Manufacturers Ass'n,* 463 U.S. at 43, 103 S.Ct. 2856); *see also Carlton v. Babbitt,* 900 F.Supp. 526, 533 (D.D.C.1995).

### A. Application of the Joint DPS Policy to the Gulf of Maine Atlantic Salmon Population

The State argues that the Services acted in an arbitrary and capricious manner by applying the Joint DPS Policy instead of the Pacific Salmon DPS Policy to the Gulf of Maine Atlantic salmon population. The State's argument seems to be that because the Services used the Pacific Salmon DPS to conduct the 1995 Status Review, that same policy should have been employed when it subsequently considered the status of Atlantic salmon regardless of the fact that the Services had developed a DPS Policy applicable to all vertebrates. The Court has already discussed the development of the Joint DPS Policy.

Absent a DPS Policy for Atlantic salmon or all vertebrate populations, the BRT conducting the 1995 Status Review borrowed the Pacific Salmon DPS Policy as a tool to help determine whether any population of Atlantic salmon qualified as a species under the ESA. *See* 1997 AR 795. At that time, the Services determined that the Atlantic salmon in the seven Maine rivers constituted a DPS under the Pacific Salmon DPS Policy because the population was both reproductively isolated from conspecific populations and was biologically significant. *See* 60 Fed Reg. 50530–31, reproduced at 1997 AR 1698.

Subsequently, when the BRT conducted the 1999 Status Review, the team determined that the Joint DPS Policy published in February 1996 and applicable to all

vertebrates, should be employed to determine whether the Gulf of Maine salmon population qualified as a "species." *See* 2000 AR 3088. When the Services announced the adoption of the Joint DPS Policy, they stated:

> This document adopts an interpretation of the term 'distinct population segment' for the purposes of listing, delisting, and reclassifying vertebrates by the U.S. Fish and Wildlife Service (FWS) and NMFS. The Services believe that the NMFS policy, as described above, on Pacific salmon is consistent with the policy outlined in this notice. The NMFS policy is a detailed extension of this joint policy. Consequently, NMFS will continue to exercise its policy with respect to Pacific salmonids.

61 Fed.Reg. 4722, reproduced at DPS AR 637. Although it is curious that after the Joint DPS Policy was adopted, the NMFS anticipated that it would continue to apply the Pacific Salmon DPS Policy when making decisions regarding the status of Pacific salmon, that issue is not relevant to the Court's inquiry regarding the application of the Joint DPS Policy to Atlantic salmon. The Services' decision to apply the recently-minted Joint DPS Policy applicable to all vertebrates was a reasonable decision and was clearly explained in the administrative record.

The State also challenges the DPS designation on numerous other bases discussed in detail in the subsections that follow. The Court concludes that the Services' findings are based on the scientific evidence in the administrative record. Based on these findings—that a specific fish's genetic makeup could be assigned to the country of its origin, and of the unique environment in which the Maine salmon live, the unique life history characteristics of Maine salmon, and evidence that the life history characteristics are heritable—the

Services' determination that the Gulf of Maine Atlantic salmon constitute a DPS is reasonable.

### 1. Discreteness

As discussed above, a population is discrete under the Joint DPS Policy if it is (1) markedly separated from other populations of the same taxon as a consequence of physical, physiological, ecological, or behavioral factors or (2) delimited by international governmental boundaries within which differences in control of exploitation, management of habitat, conservation status, or regulatory mechanisms exist that are significant in light of section 4(a)(1)(D) of the ESA. *See* 61 Fed.Reg. 4722, reproduced at DPS Policy AR 637. The Services assert that the Gulf of Maine DPS satisfies both tests for discreteness. The State contends that the salmon in the eight Maine rivers have been extirpated or, if not extirpated, then the genetic integrity of the salmon has been swamped by stocking efforts on the rivers and the natal straying of fish from their natal streams. The State also asserts that there are few differences between the regulation and treatment of Atlantic salmon in Canada and the United States.

### a. The Gulf of Maine Atlantic Salmon Population is Separate

When studying whether the Gulf of Maine salmon are a DPS, the BRT noted that "[r]eproductive isolation does not have to be absolute to allow evolutionarily important differences to accrue in different population units, only strong enough for these differences to develop and be main-

tained." 1999 Status Review, reproduced at 2000 AR 3099. In its study, the BRT considered: (1) whether the population has persisted, (2) the history of fish stocking into the Maine rivers, (3) the geographic segregation of the Gulf of Maine population from other populations, and (4) the genetic differences observable between Gulf of Maine population and other populations. *See* 65 Fed.Reg. at 69460, reproduced at 2000 AR 5040. In their July 1999 Status Review, the BRT concluded that the Gulf of Maine salmon population is "markedly separated from other populations of the same taxon." *See* 2000 AR 3100.

### i. The Gulf of Maine Population has Persisted

The 1995 Status Review developed river profiles for each of the DPS rivers that reviewed the history of the salmon populations and discussed their status. *See* 1995 Status Review, 1997 AR 853–890. The BRT conducting the 1999 Status Review considered that salmon were extirpated from a river if there was a documented absence of salmon for two generations; that is, twelve years.[18] *See* 1999 Status Review, reproduced at 2000 AR 3091. Employing the river profiles as well as other studies, the BRT determined that wild salmon populations persisted in eight Maine rivers.[19] *See* 1999 Status Review, reproduced at 2000 AR 3097.

Questioning the Services' findings that wild Atlantic salmon still exist in the designated rivers, the State contends that the Services erroneously relied on a reported straying rate and, therefore, a level of

---

18. The reason for requiring the absence of Atlantic salmon for two generations is that, "[a]t any one point in time, there are usually 5 or more different generations, or year classes, of a river population in existence. A failure of one spawning year class does not represent extinction." 65 Fed.Reg. at 69464, reproduced at 2000 AR 5045.

19. For four other rivers where the available evidence was inconclusive about the persistence of a wild salmon run, the BRT recommended listing the salmon in those rivers on a candidate species list. *See* 1995 Status Review 25–27, reproduced at 1997 AR 802–04.

gene flow that was too low for the Gulf of Maine populations. *See* Plaintiff State of Maine's Motion for Summary Judgment at 26–27. The Services acknowledge a small level of straying but assert that it does not affect a salmon population's status as "separate." The BRT found that during migration to natal rivers for spawning, Maine salmon are known to stray to other rivers at a rate of 2 %, creating a gene flow among individual river stocks. *See* 1999 Status Review, reproduced at 2000 AR 3100. Indeed, in the case of the Maine DPS, observed straying is almost always among DPS rivers. Only one stray from Canada has been documented. 1999 Status Review AR Doc. 28 at 8. The study upon which the State relies finding a straying rate of 7.9 % for the Narraguagus river and 15.9 % for the Machias river recognizes that "[t]he highest incidence of straying (1969 releases) may have been caused by an error when the smolts were released (*i.e.,* some Machias fish may have been stocked in the Narraguagus and vice versa)." 1997 AR Scientific References Vol. 2, Doc. 18. In any event, the Services dispute the State's belief that the stray rate necessarily corresponds to gene flow. Explaining the basis for the lack of correlation, the Services point out that straying rates are estimated by recording the presence of marked fish in a river other than their river of origin. This detection and recording occurs at a trapping facility, not when spawning has actually occurred. *See* 2000 AR 3100. Thus, the Services point out that straying rate does not simplistically equate to gene flow. Unless the straying fish reproduces successfully in its new river, no gene flow occurs. *See* 1999 Status Review Doc. 28 at 30.

The Services' conclusion that wild runs of salmon have persisted within the DPS was adequately explained and was reasonable based on the scientific evidence in the administrative record.

## ii. Effect of Fish Stocking on the Gulf of Maine Population

The State also argues that any genetic legacy in the DPS rivers has been overcome by stocking. The Services respond that prior to 1971, stocking success was relatively poor. *See* 2000 AR 3078; 1999 Status Review AR Doc. 28 at 123. Despite the large numbers of stocked fish, only a fraction of 1 % of the stocked fry would return as spawning adults that could affect the gene pool. *See* 1999 Status Review Doc. 28 at 31–34. After 1971, the majority of the stocking from the non-DPS sources was from the Penobscot River, which is within the geographic range of the DPS, and which the Services stated that they would review to determine its status. *See* 1999 Status Review, reproduced at 2000 AR 3090–87. The Penobscot hatchery stock was developed from DPS stocks, so that the majority of fish stocked in DPS rivers since 1971 were derived from DPS stocks. *Id.* at 3078. DPS river stocks are more similar to other DPS river stocks genetically than they are to non-DPS river stocks; thus, the Services assert, stocking from other DPS stocks would have less impact on the genetic legacy of the DPS salmon runs.

The 1999 Status Review examined the effect of stocking practices on the Gulf of Maine population. The BRT found that:

> The fact that artificial selection of hatchery environments has had some influence upon the present genome of the Gulf of Maine DPS cannot be totally negated. Given our current understanding of the genetic composition of these stocks (Bentzen and Wright 1992; Kornfield 1994; King *et al.* 1999), the documented persistence of native stocks (Kendall 1935; Baum 1997), and the fact that most of the hatchery stocking influences were internal to the Gulf of Maine

DPS and the Penobscot River Hatchery stock (Table 4.2.2.)(Baum 1997), the BRT concludes that the influence of hatchery fish upon the DPS has not been sufficient to completely or substantially introgress with the remnant populations and genomes of the Gulf of Maine DPS.

1999 Status Review, reproduced at 2000 AR 3111. The Services' conclusion that wild salmon in the Maine rivers were not "swapped" by stocking initiatives was adequately explained and reasonable based on the scientific evidence in the administrative record.

### iii. Maine Rivers are Geographically Separate

The State argues that the Services' reliance on geography is unlawful. The Services make a distinction between ecological setting and political geography.

The Services assert that their reliance on zoogeographic maps to determine what range adaptation took place was reasonable based on the differences in life history traits and physical characteristics which were likely the product of adaptation to a unique environment. The Services concluded that the DPS rivers are substantially different ecologically from rivers north and south, 2000 AR 3107, 3096, which, the Services assert, means that the Atlantic Salmon that range in the DPS rivers have evolved characteristics specific to and necessary for survival in the DPS rivers. *Id.*

In their analysis of the Gulf of Maine salmon population, the Services consulted zoogeographic maps to determine which rivers likely exerted different evolutionary pressures on Atlantic salmon. *See* 65 Fed. Reg. 69459, reproduced at 2000 AR 5040. Zoogeographic maps indicate changes in ecological setting. Such maps show at what range a species may have been affected by evolutionary pressures in a spe-

cific direction. *See* DPS Policy Ref. Doc. 17, at 14. Studies have found that "there are several life history characteristics which distinguish Canadian and U.S. fish." *See* 2000 AR 7060. For example, Maine Atlantic salmon have a higher proportion of adult returns as 2–sea winter fish (over 80% in Maine and fewer than 50% in Canada and Europe). Also, Maine Atlantic salmon smoltify at a mean age of two years, whereas Canadian salmon may take two to five or more years to reach smolt size. *See* 2000 AR 5075. These traits are known to be at least partially heritable. *See* 2000 AR 7060. The Services contend that the existence of these differences, coupled with the unique ecological range of the fish, indicate that the Maine salmon adapted to their local environment and are separate from other Atlantic salmon populations. The Services listing decision ultimately concluded that

> analyses of Atlantic salmon data suggest that while environment has a strong influence upon juvenile growth, smolt age, and maturation (precocious parr)(Brannon, 1982), heritable differences between stocks also influence growth and performance (Baily, 1980; Hershberger *et al.*, 1982; Iwamoto *et al.*, 1986; Kincaid, 1994; and Hutching and Jones, 1998) and ultimately determine the ability of stocks to exploit their native habitat (Metcalfe, 1998).

65 Fed Reg. 69466, reproduced at 2000 AR 5047. This conclusion was adequately explained by the Services and was reasonable based on the studies found in the administrative record.

### iv. The Gulf of Maine Population is Genetically Distinct

The Services found that although the Gulf of Maine populations may not exist "in a genetically pure native form," the remaining salmon from these rivers "are

descendants of these aboriginal stocks," and exhibit "important heritable local adaptations." 65 Fed.Reg. 69460, reproduced at 2000 AR 5041. The Services relied on an extensive, range-wide population genetics survey of mitochondrial and nuclear DNA variation in Atlantic salmon with an emphasis on Maine rivers that found significant genetic differences between Maine Atlantic salmon and Canadian Atlantic salmon. *See* 1999 Status Review AR Doc. 181 (King *et al.*, 1999). In addition to standard analyses of genetic differences, the survey conducted assignment tests and, based on genetic typing, correctly assigned fish to the continent of origin 100 % of the time. *Id.* at 4. Canadian fish were correctly assigned to Canada 93.9 % of the time, and U.S. fish were correctly assigned to the U.S. 77.3 % of the time. *Id.* at 4. U.S. fish within the DPS were correctly assigned to their individual river of collection 41.5 % of the time. *Id.* at 29.

The State's scientists criticized the techniques used in the King study as well as the conclusions that were reached from the study. The State submitted two critiques prepared by Dr. Irv Kornfield and Dr. Gold of the 1999 study on Atlantic salmon genetics performed by Dr. Tim King. *See* 2000 AR 7744–7788, 7789–7827. The Services requested a member of the King research team to review the critiques submitted by the State of Maine and report how those critiques change King's analysis. The Services considered the criticisms, and a review of them found that

> [w]hile many of Gold and Kornfield's specific points are technically valid, rigorous application of their alternate interpretations of the report would not materially change its conclusion that the Atlantic salmon of Downeast Maine are a discrete population, separate from other populations examined in North Amer-

ica, and from throughout the rest of their natural distribution.

2000 AR 4975. The scientist also found that "[g]enetic distance demonstrates that Maine's Atlantic salmon are a discrete set of populations within North America, which as a whole is distinct from European Atlantic salmon." *Id.* The BRT found that

> there are components of an important genetic legacy remaining in these populations and the loss of these populations would negatively affect the genetic resources of Atlantic salmon as a whole. As the most southerly populations, the genetic resources of these stocks may be vitally important to future stock health in scenarios of climate warming.

2000 AR 3111.

The Services conclusion regarding genetic legacy was adequately explained and reasonable based on the competing scientific evidence and opinions in the administrative record.

#### v. Status of the Penobscot River

The State questions the rationality of the Services' decision not to include the Atlantic salmon from the Penobscot River in the DPS. From a review of the administrative record, it appears that there was some question as to whether it was reasonable for the Services to reserve decision on the status of the Penobscot River. To determine whether to include a river in the DPS, the Services examined (1) whether there existed a reproducing population that historically had access to natal spawning habitat adequate to have persisted and (2) the likelihood and extent of introgression with fish from outside the geographic range of the DPS, *e.g.*, stocking history, return rates of stocked fish, origin of returning adults, and genetic characterization. *See* 64 Fed.Reg. 69464, reproduced at 2000 AR 5045. The Services found that at the time of listing, there was insufficient information to decide whether to include

the Penobscot River north of the Bangor dam in the DPS. *See* 2000 AR 3097. Although tributaries in the lower portion of the river "were included within the geographic range of the DPS because of their continued historic free access to migrating salmon," 65 Fed.Reg. 69464, reproduced at 2000 AR 5045, the Services reserved decision on whether to include those portions of the Penobscot River upstream of the Bangor dam in the DPS because of the lack of comprehensive data. *See* 2000 AR 3097. The Court finds that the Services' articulated choice to collect more information before making a final decision on the Penobscot River to be reasonable based on the evidence in the administrative record.

### vi. Hatchery Fish

The State objects to the Services' treatment of hatchery fish. Hatchery fish are included in the DPS designation and are considered part of the listed entity. *See* 65 Fed.Reg. 69459, reproduced at 2000 AR 5045. Hatchery fish are used to recover the Gulf of Maine DPS; however, the number of fish held in the hatchery will not be counted toward a numerical recovery goal. The Services assert that they will measure their contribution when the hatchery fish's offspring are outplanted, smoltify, migrate to sea, and return to spawn in the wild. *Id.* at 69473.

The Services point out that for the purposes of the ESA, recovery means "improvement in the status of the listed species to the point at which listing is no longer appropriate under the criteria set out in Section 4(a)(1) [16 U.S.C. § 1533(a)(1)] of the Act." 50 CFR § 402.02. Because all of the stocked fish in the DPS rivers could die without having spawned successfully, the Services contend that it is overly simplistic to simply count the hatchery fish towards a numeric recovery goal. The Court finds the Services'

expressed reason for the treatment of hatchery fish to be reasonable.

### b. Regulatory Mechanisms in Canada and the United States

Under the Joint DPS Policy, the Gulf of Maine population meets the second, independent test for discreteness if the population is "delimited by international governmental boundaries within which differences in control of exploitation, management of habitat, conservation status, or regulatory mechanisms exist that are significant in light of section 4(a)(1)(D) of the ESA." 65 Fed Reg. 69459, reproduced at 2000 AR 5040; 61 Fed.Reg. 4725, reproduced at DPS Policy AR 640. The State argues that this test for discreteness is not satisfied where there are Canadian regulations used to protect Atlantic salmon, and that a Canadian study completed in March 2000 found that "in recent years differences in the control of exploitation, management of habitat, and regulatory mechanisms between the United States and Canada have been practically eliminated." 2000 AR at 7705.

The Services' listing decision concluded that despite the fact that "management and conservation programs in the United States and Canada have similar goals, ... differences in legislation and policy support the use of the United States/Canada international boundary as a measure of discreteness for the purposes of evaluating stock status." 65 Fed.Reg. 69460, reproduced at 2000 AR 5041. The Services reached this conclusion after reviewing relevant papers on the topic and considering their own experience with Canadian authorities on research and management of Atlantic salmon. *See, e.g.,* 2000 AR 366, 2000 AR 3410, 2000 AR 7863 (no Canadian equivalent to the ESA). Given the administrative record, the Court will not second-guess the Services' conclusion that there are differences in Atlantic salmon legisla-

tion and policy between Canada and the United States sufficient to support the finding of discreteness.

## 2. Significance

In making the listing decision, the Services next considered the "significance of the population segment to the species [ ] to which it belongs." 65 Fed.Reg. 69459, reproduced at 2000 AR 5040. As explained above, a population's significance is considered based on four nonexclusive factors: (1) persistence of the discrete population segment in an ecological setting unusual or unique for the taxon, (2) evidence that loss of the discrete population segment would result in a significant gap in the range of a taxon, (3) evidence that the discrete population segment represents the only surviving natural occurrence of a taxon that may be more abundant elsewhere as an introduced population outside its historic range, or (4) evidence that the discrete population segment differs markedly from other populations of the species in its genetic characteristics. *See* 61 Fed.Reg. 4725, reproduced at DPS Policy AR 640. The Services found that the Gulf of Maine DPS met three of the four indicators of significance.

### a. Gulf of Maine Population has Persisted in a Unique Ecological Setting

Both Maine and Canadian Atlantic salmon populations range during marine life to the northwest Atlantic Ocean, but the Gulf of Maine DPS's freshwater range is at the southern limit of the North American range of Atlantic salmon. *See* 2000 AR 3106. This range in a unique ecoregion called a Laurentian Mixed Forest Province of coastal Maine, *id.*, and the DPS rivers are short coastal rivers. *Id.* at 3107. To survive, the Services concluded, the Maine salmon populations had to adapt to distinct physical and environmental conditions.

*Id.* ("Occupation of the southern portion of the range exposes U.S. salmon to riverine and oceanic selection factors different from those experienced by more northern stocks."). The Court finds, that based on the scientific data in the administrative record, it was reasonable for the Services to have concluded that the Gulf of Maine discrete population has persisted in a unique ecological setting for Atlantic salmon.

### b. Extinction of the Gulf of Maine Population Would Result in a Significant Loss of Range of Atlantic Salmon

If the Gulf of Maine discrete population becomes extinct, the Services found, the range of Atlantic salmon will move an additional degree of latitude to the north. *See* 2000 AR 3108. The extinction of the Gulf of Maine discrete population "would restrict the natural range of Atlantic salmon above the 45th parallel and beyond the borders of the U.S.A." *Id.* This loss would be in addition to the 2 degrees of latitude already lost to extirpation of Atlantic salmon from southern New England. The Court concludes that the Services were reasonable in finding that if the Gulf of Maine DPS became extinct, the result would indicate a significant loss of range for Atlantic salmon.

### c. Gulf of Maine Population Differs Markedly in its Genetic Characteristics

The State contends that any genetic differences that exist between Gulf of Maine DPS salmon and Canadian salmon are the result of small population size and do not provide evidence of the existence of historical, adaptively important genetic differences. The 1999 Status Review studied the phenotypic and life history characteristics of Maine salmon as compared with Canadian salmon and concluded that "the

DPS has unique life history characteristics that have a heritable basis" and that "both environmental and genetic factors make the Gulf of Maine DPS markedly different from other populations of Atlantic salmon in their life history and ecology." 1999 Status Review, 2000 AR 3110. Although it is not known to a certainty, the available scientific evidence suggests that the genetic differences observable between Maine salmon and Canadian salmon are the result of adaptation. The Court concludes that, despite competing expert opinions, the Services were reasonable in concluding that the Gulf of Maine DPS population markedly differs from other populations in its genetic characteristics and, therefore, satisfies the fourth test for significance.

**B. The Services' Listing Decision**

■ Section 4 of the ESA sets forth the factors that the Services are to consider when making a decision on whether to list a species:

(A) the present or threatened destruction, modification, or curtailment of its habitat or range;

(B) overutilization for commercial, recreational, scientific, or educational purposes;

(C) disease or predation;

(D) the inadequacy of existing regulatory mechanisms; or

(E) other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(1). These factors must be evaluated based on the "best scientific and commercial data available." 16 U.S.C. § 1533(b)(1)(A). Although the Services need only find that one of the listing factors found in § 1533(a)(1) is satisfied, here the Services found that each of the factors are implicated for the Gulf of Maine DPS.

Based on the administrative record in this case, it is clear that in listing the Gulf of Maine DPS of Atlantic salmon as endangered the Services acted in a manner that was not an abuse of discretion, arbitrary, capricious, or contrary to law. With regard to habitat threats, the Services found that the Gulf of Maine DPS is adversely affected by water withdrawals and other threats, such as exposure to pesticides and insecticides and elevated water temperatures due to processed water discharges. *See* 65 Fed.Reg. at 69475, reproduced at 2000 AR 5056. As for over-utilization, the Services found that the continued fishing for Atlantic salmon which occurs near Greenland is a "continuing concern"; that the incidental catch of salmon as part of other fisheries "poses a threat"; and that "poaching continues to pose a threat to Atlantic salmon." 65 Fed.Reg. 69476, reproduced at 2000 AR 5057. With respect to disease and predation, the Services explained that ISA, SSSV, and CWD all pose "increased disease [ ] threat[s]" to the DPS, and that, due to low population, "[t]he threat of predation on the Gulf of Maine DPS of Atlantic salmon is significant today," particularly by seals. *Id.* at 69476–77. On the issue of whether existing regulatory mechanisms are adequate to protect the DPS, the Services explained that, in several critical areas, such as water withdrawals, disease, and aquaculture, "[e]xisting regulatory mechanisms either lack the capacity or have not been implemented adequately to decrease or remove the threats to wild Atlantic salmon." *Id.* at 69477. Considering "other natural or manmade factors" impacting the salmon, the Services found that the aquaculture industry "create[s] a danger of extinction," 65 Fed.Reg. 69478, reproduced at 2000 AR 5059, because fish that escape from the cages compete for habitat, spread disease, and interbreed with the wild salmon populations. *Id.* at 69477–78.

The parties have fundamentally different positions on what, it anything, changed between the time when the threatened listing was withdrawn in December 1997 and the reinitiation of the endangered listing in November 1999 that caused the Services to reinitiate the listing process. The State asserts that it was the Services' concerns over litigation that motivated the Services to reinitiate the listing process and ultimately list the Gulf of Maine DPS as endangered. The State also argues that the 2000 listing decision cannot be reconciled with the Services' 1997 decision not to federally protect the Gulf of Maine DPS. Neither of these issues is directly relevant to the Court's review of the legality of the Services' decision to list the Gulf of Maine DPS as endangered. The Court is not reviewing the reasonableness of the Services 1997 decision to withdraw the listing. After a thorough review of the administrative record, this Court finds that there were significant changes in the circumstances that led the Services to reinitiate and ultimately list the Gulf of Maine DPS as endangered. However, even if there were no change in circumstances, the Court's inquiry would still be focused on whether, based on the best scientific evidence, the administrative record supports the listing of the Gulf of Maine DPS as endangered. To that end, the Court considers whether the Services have "examined the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Manufacturers Ass'n*, 463 U.S. at 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 245–246, 9 L.Ed.2d 207 (1962)). Here, considering each of the listing factors in light of the overall population numbers, the continued threats to survival, and the changes in conditions that occurred since 1997, including the assessment of the State's Annual Report on the Conservation Plan's implementation, the Services reasonably concluded that the Gulf of Maine DPS is in danger of extinction. The Court will, nevertheless, address the State's arguments.

### 1. Litigation Concerns

The State asserts that reinitiation of the listing process as well as the listing decision were motivated by litigation concerns rather than any conditions that had changed with respect to the Gulf of Maine DPS; specifically, that the Services initiated and ultimately listed the DPS after agreeing to do so as part of a settlement in another case. The Services disagree.

The State relies on the following facts to support its position that the Services were improperly motivated. Six months after the Services withdrew the proposed listing in 1997, the United States District Court for the District of Oregon issued an opinion holding that NMFS, in determining that a population of Pacific Coho salmon did not warrant ESA listing, had improperly relied upon a conservation plan developed by the State of Oregon. *See Oregon Natural Resources Council v. Daley*, 6 F.Supp.2d 1139 (D.Or.1998) *("ONRC")*. The court found that Oregon's plan contained measures that had not yet been implemented and other measures which were voluntary and could not be enforced. *Id.* at 1147. The court then held that NMFS, in deciding whether to list a species, "may only consider conservation efforts that are currently operational, not those promised to be implemented in the future." *Id.* at 1154. The court further held that NMFS may not consider "unenforceable efforts" because "voluntary actions ... are necessarily speculative." *Id.* at 1155.

The Services disputed the correctness of the *ONRC* court's holding and believed that they were thoroughly entitled to rely on Maine's Conservation Plan and those of other states. *See* 2000 AR 934. Maine's Conservation Plan was different from that of Oregon in that Maine's plan contained numerous ongoing and mandatory conservation measures, while Oregon's plan consisted largely of planned and voluntary measures. 1997 AR 4288–4727; *see also* 62 Fed.Reg. 66338, reproduced at 1997 AR 5784

After learning of the *ONRC* decision, a Department of Interior attorney stated that notices of intent ("NOI") to sue had been filed, and that the "plaintiffs would likely sue before the Services reached any new conclusions (*i.e.*, re-proposed listing) next June." 2000 AR 380, 813. The attorney expressed concerns about such a suit and suggested that "it would be great if some creative thinking got around the NOI suit (without making the Services vulnerable to a state suit)." *Id.* Shortly thereafter, the same Interior Department attorney stated that a third notice of intent to sue had been filed, but that it was hoped that plaintiffs would not file suit until the Services had an opportunity to review the State's first annual report and decide whether to reinitiate the listing process. *See* 2000 AR 842–43.

In early January 1999, the State submitted a draft report on the first year of implementation of its five-year Conservation Plan. *See* 64 Fed.Reg. 3067, reproduced at 2000 AR 7873. The Services invited the public to comment on the draft report and also used the opportunity to announce their intention to conduct a new status review of the Atlantic salmon population. 64 Fed.Reg. 3068, reproduced at 2000 AR 7874. The Services stated that after completing the status review, they would decide whether to reinitiate the listing process. *Id.*

In January 1999, the lawsuit threatened in the NOIs was filed, with various individuals and environmental organizations, including Defenders of Wildlife, filing a lawsuit (the "Defenders of Wildlife lawsuit") in the United States District Court for the District of Columbia challenging the Services' December 1997 decision to withdraw the proposed rule which would have listed the DPS of Atlantic salmon as threatened under the ESA. 2000 AR 1725; Complaint in *Defenders of Wildlife v. Bruce Babbitt*, No. 99–CV–00206–CKK (D.D.C., Jan. 27, 1999), attached to Statement of Material Facts as Exhibit A.[20] Among the allegations in the Defenders of Wildlife lawsuit were that the State's Conservation Plan contained future and voluntary measures, and that the Services improperly considered the Plan in deciding to withdraw the proposed listing. *Id.* at ¶¶ 55, 60–63. Defenders of Wildlife requested both an emergency and permanent listing of the DPS of Atlantic salmon. *Id.* at ¶¶ 75–76. On October 19, 1999, nine months after the Defenders of Wildlife filed suit, the Services released the Status Review, announced that it indicated that the DPS of Atlantic salmon "is in danger of extinction," and stated that they would "promptly begin preparation of a proposed rule to list this DPS of Atlantic salmon under the Endangered Species Act." 64

---

**20.** The State cites to documents that it contends "demonstrate" that the Services based their listing decision on litigation concerns. The State has moved to supplement the record or, in the alternative, for the Court to consider extra-record documents. Plaintiff State of Maine's Motion to Supplement Record or, In the Alternative, For Court to Consider Extra–Record Evidence (Docket Item No. 64). The Services oppose the supplementation. The Court will deny the State's motion to supplement the record, but grant State's request to have the Court consider the documents.

Fed.Reg. 56297–98, reproduced at 2000 AR 3806–07.

On November 17, 1999, less than two years after the Services had determined that the DPS of Atlantic salmon was "not likely to become endangered in the foreseeable future," the Services announced that the DPS was now "in danger of extinction" and proposed a rule listing the DPS as "endangered" under the ESA. 64 Fed.Reg. 62627, reproduced at 2000 AR 4044. The Gulf of Maine DPS was defined as including "all naturally reproducing wild populations of Atlantic salmon having historical, river-specific characteristics found in a range north of and including tributaries of the lower Kennebec River to, but not including, the mouth of the St. Croix River at the US–Canada border." 64 Fed.Reg. 62629, reproduced at 2000 AR 4046. In June 2000, the Services and the plaintiffs in the Defenders of Wildlife lawsuit entered into a stipulation staying all aspects of the litigation pending a decision by the Services as to whether the proposed rule would be converted into a final rule. *See* Stipulation, attached to Statement of Material Facts as Exhibit B. The Services stipulated that they would make a final decision by November 17, 2000, and they waived their statutory authority to take a six-month extension to solicit additional scientific data.[21] *Id.*

The State's arguments fail to convince the Court that the Services considered anything other than the best scientific evidence and the ESA in making the listing decision. This conclusion is not disturbed by the evidence that some stratagem was involved on the part of the Services in an attempt to minimize their exposure to litigation. The Services were certainly aware of the ongoing progress of the Defenders of Wildlife litigation at the same time that the Services were reviewing and preparing a response to the State's Progress Report with respect to the Conservation Plan, meeting with the State and the aquaculture industry in an effort to address the Services' concerns about the use of foreign genetic material, and updating the Status Review for the DPS. *See* 2000 AR 2764–65. As these processes simultaneously unfolded, it was evident that there was a possibility that the Status Review might suggest that listing was appropriate. *Id.* at 2751. The State's position that the Services were motivated to list the Gulf of Maine DPS in order to settle the Defenders of Wildlife suit is specious. Indeed, in most instances, the Services' decisions whether it be to list, or not to list, a species will be challenged. It is, therefore, illogical to suggest that the Services were motivated to list the Gulf of Maine DPS in order to settle the Defenders of Wildlife suit when that lawsuit was exchanged for the instant one.

## 2. The Services' New and Ongoing Concerns Regarding the Status of the Gulf of Maine DPS

Although many of the threats were present in 1997 when the listing was withdrawn, it appears that the Services' 1997 decision to withdraw the listing was largely premised on the expectation that the Maine Conservation Plan would adequately protect the salmon and avoid the need for listing. *See* 62 Fed.Reg. 66329, 66331, 66335–36, 66338, reproduced at 1997 AR 5788, 5790, 5794–95, 5797. However, after the Services received Maine's first Annual Report on implementation of the Conservation Plan in January 1999, the Services

---

**21.** The Services stipulated away the extension over the written objection of the State, which noted that the Services could not possibly have yet determined whether they would ultimately need more time to collect and assess additional data. *See* State's Response to Stipulation, attached to Statement of Material Facts as Exhibit C.

became concerned about changes in circumstances and the sufficiency of the Conservation Plan. *See* 2000 AR at 1643, 1645–46, 1647, 1662–63, 1665; *see also* 65 Fed. Reg. 69477, reproduced at 2000 AR 5058 (In making the 2000 listing decision, the Services concluded that "[e]xisting regulatory mechanisms either lack the capacity or have not been implemented adequately to decrease or remove the threats to wild Atlantic salmon.")

Over the next year, the Services became aware of evidence that the Gulf of Maine DPS was not being adequately protected. In the spring and summer of 1998, the Services began to have concerns about continuing threats to the Gulf of Maine DPS Atlantic salmon. *See, e.g.,* 2000 AR 315 (concerns about monitoring); 2000 AR 357 (Briefing for Secretary of Interior noting "concerns that State of Maine will not effectively implement the plan and the current low population of Atlantic salmon returning from the ocean."); *id.* at 358 (questioning adequacy of State funding). Ultimately, the Services listed the Gulf of Maine DPS as endangered because they found that the survival of the DPS population was at risk because of the threat of disease, the lack of adequate regulatory mechanisms to address concerns about agricultural water withdrawals and other agriculture practices, and threats arising from aquaculture practices. *See* 65 Fed. Reg. at 69478–79, reproduced at 2000 AR 5059–60. These concerns were heightened by low juvenile survival rates and declining adult returns. *Id.* at 69479.

By December 1998, the Services had raised several specific issues with the State since the Notice of Withdrawal of the Proposed Listing Rule was published in November 1997. *See* 2000 AR 850. These included (1) continued use of foreign stocks by aquaculture; (2) the lack of progress in the weir construction program;

(3) water level management in DPS rivers; and (4) follow-through on an Infectious Salmon Anemia ("ISA") virus survey of aquaculture operations. *Id.* The Services considered these areas to be "potential problems relative to demonstrating progress in [the] anticipated [annual] progress report." *Id.* In January 1999, the State presented its first Annual Progress Report on implementation of the Conservation Plan. *See* 2000 AR 936–1279. The Services published a notice announcing the availability of the Annual Report and requested public assistance in determining whether the protective measures in place, including the provisions of the Conservation Plan, remained adequate to protect the species in light of current knowledge. *See* 64 Fed.Reg. 3067 (Jan. 20, 1999), reproduced at 2000 AR 1317. The Services also stated that they intended to update the 1995 Status Review. *Id.*

On March 24, 1999, the Services provided the State with the Services' comments and a summary of those comments submitted by the public. *See* 2000 AR 1833. The Services summarized eight major themes in a cover memorandum. *See* 2000 AR 1643–65. The Services expressed concerns about delays to codify the code of containment (*id.* at 1645), establish a system of compliance monitoring and enforcement, *id.* at 1655, construct weirs, *id.* at 1649, and institute fish health protocols and disease eradication measures. *Id.* at 1655. At that time, the Services also expressed concerns about water withdrawals. *Id.* at 1646, 1650.

Representatives of the Services and the State again met on April 9, 1999, to discuss "some of the . . . issues raised in the Services' March 24, 1999, letter to the State on the Annual Progress Report." 2000 AR 1773. The State submitted an addendum to its report on April 23, 1999. *See* 2000 AR 1858. On May 4, 1999, Ed

Baum, the Coordinator for Atlantic Salmon Restoration and Management Programs for the State's Atlantic Salmon Authority, wrote to the State's Commissioner for the Department of Marine Resources noting that aquaculture escapees posed concerns including "potential negative genetic, ecological, disease/parasites, habitat and management interactions." 2000 AR at 2635. Baum further noted that "[t]he reasons for those concerns are well-documented in numerous, peer-reviewed, fisheries and other scientific literature in both North America and Europe." *Id.* During this time, the Services were continuing to update the Status Review. On May 19, 1999, a headquarters briefing was provided on the Conservation Plan, Status Review, ongoing discussions with the aquaculture industry, and the *Defenders of Wildlife* litigation. *See* 2000 AR 2742. Services' biologists presented their conclusions that "[t]he Gulf of Maine DPS of Atlantic salmon is in danger of extinction." *Id.* at 2751. Nevertheless, the Services and the State worked together, along with the aquaculture industry and the Army Corps of Engineers ("the Corps"), in an effort to resolve disagreements about the use of foreign genetic resources. *See* 2000 AR 2670 (indexing, *inter alia,* correspondence found at 2000 AR 347, 351, 365, 371, 745–48, 766, 772, 775, 881).

The facts relevant to the new and ongoing concerns regarding the health and survival of the Gulf of Maine DPS which led the Services to reinitiate the listing process are discussed below. The Court concurrently presents evidence from the administrative record that supports the listing of the Gulf of Maine DPS as endangered.

### a. Aquaculture Industry

Aquaculture salmon are raised in large pens in close proximity to or in hatcheries located on DPS rivers. *See* 2000 AR 2666, 3226. The number of sites employed by the aquaculture industry had increased from 25 sites in 1997 to 33 sites in 1999. *Compare* 1997 AR at 4535 (1997 Conservation Plan) *with* Listing Decision AR at 3226 (Status Review). Moreover, over time the salmon cages used in aquaculture operations are getting bigger. 1997 AR at 4536. The Services claim that "continuing concerns about threats posed by aquaculture escapees" and "lack of progress in resolving concerns over existing aquaculture practices" justify their change in position. 65 Fed.Reg. 69464, reproduced at 2000 AR 5045. Specifically, the Services cite to the use by some aquaculture businesses of reproductively viable European strains of Atlantic salmon and the industry's alleged failure to prevent escapes of aquaculture fish. 65 Fed.Reg. 69477–78, reproduced at 2000 AR 5045. The aquaculture industry creates concerns for wild Gulf of Maine Atlantic salmon because escaped farmed salmon disrupt spawning areas, compete with wild salmon for food and habitat, interbreed with wild salmon, and transfer disease. *See* 2000 AR 3690–92; 65 Fed.Reg. 69477–78, reproduced at 2000 AR 5058–59 (noting presence of escapees in four of the DPS rivers and that escaped farmed salmon represent 89 % and 100 % of documented run for the Dennys in 1994 and 1997, respectively). There is also some evidence that disease may spread from caged fish to wild salmon and that wastes generated by large concentrations of caged fish temporarily degrade the benthic habitat. *See* 2000 AR 3690–92; 65 Fed.Reg. 69478, reproduced at 2000 AR 5059.

At the time the Conservation Plan was announced and the proposed listing rule was withdrawn, the Services believed that the most significant threats posed by escaped farmed fish would be alleviated by full implementation of a code of contain-

ment and construction of weirs at which aquaculture stock could be removed. *See* 62 Fed.Reg. at 66332, reproduced at 1997 AR 5791. In the two years after the withdrawal of the listing and the implementation of the Conservation Plan, the impact of aquaculture on the Gulf of Maine DPS emerged as a significant concern to the Services. *See* 65 Fed.Reg. 69477, reproduced at 2000 AR 5058. As time progressed, the Services became aware that the voluntary code of containment had not prevented escapes, 65 Fed.Reg. 69478, reproduced at 2000 AR 5059, and the State and the aquaculture industry resisted implementation of a regulatory code of containment. *See* 2000 AR 7889.

In addition, the Services' concerns regarding use of foreign genetic resources in aquaculture remained unresolved.[22] 2000 AR 2763. Although the State of Maine prohibited the importation of live salmon stock and eggs, the Services became concerned when they learned in October 1999 that aquaculturists were seeking approval to import Icelandic milt and eyed eggs and

had applied to the State for an exemption to the prohibition on importation.[23] *See* 2000 AR 3786, 3787. The State Conservation Plan reported in 1997 that 10 % of aquaculture fish were of the Norwegian Landcatch strain. 1997 AR 4536. The following year it was reported that the figure was 20 % to perhaps as much as 30 %. *See* Status Review Ref. Doc. 29, at 3, 13. In addition, it was reported elsewhere in 1998 that European strains might account for anywhere from 30 to 50 percent of farm-raised fish in Maine. Additional References Doc. 14, at 4–5. Appreciating the potential problems from interbreeding of wild and farmed salmon, the North American Salmon Commission of the North Atlantic Salmon Conservation Organization ("NASCO"), an international body of which the United States is a party, *see* Atlantic Salmon Convention Act of 1982, 16 U.S.C. §§ 3601–3608, adopted Protocols for the Introductions and Transfers of Salmonids that prohibit use of reproductively viable European and Icelandic stock in

22. On June 5, 1998, representatives of the Services, the Corps, Maine Aquaculture Association ("MAA"), and representatives from the aquaculture industry met to discuss concerns. *See* 2000 AR 745. No resolution had been reached by the autumn of 1998. *See, e.g.,* 2000 AR 747. On October 22, 1998, NOAA Fisheries advised both the MAA and the Corps that NOAA Fisheries considered addressing the continuing aquaculture threat to be "a critical portion of the overall protective strategy of the" Atlantic salmon. *Id.* at 746, 748. The Services noted that they would be considering the status of the Atlantic salmon the following spring after they had received the State's first annual report on implementation of the Conservation Plan, due in January 1999. *Id.* As such, they stated that it was critical to reach resolution on the aquaculture issues by March 15, 1999. *Id.* In response, the MAA reiterated its view that European strain fish were essential to its competitiveness and that the federal government had no jurisdiction to require compliance with the NASCO protocols. 2000 AR 775. The MAA

also rejected the notion of a March 15, 1999, deadline because it claimed the deadline "was met long ago with the Maine Atlantic Salmon Conservation Plan solution." *Id.* at 777.

23. The industry plainly stated its intention to continue using pure and European hybrid stocks. *See, e.g.,* 2000 AR 776 (president of Maine Aquaculture Association stating: "Any limitation imposed by NMFS on the ability of Maine aquaculture companies to compete in the development of a high quality, low cost fish using European strain breeding programs will destroy our ability to remain competitive."); *see also id.* at 708 ("The plan by industry members to again import Icelandic salmon milt this year confirms their past voiced position of not accepting the Protocols' prohibition on importation of foreign stocks of salmon as part of their breeding program."). The State confirmed that state law provided for such an exemption. *See* 2000 AR 3787, 3786 ("Now aquaculture operators can import anything at any life stage.").

aquaculture in U.S. and Canadian sea pens. Status Review Ref. Doc. 239; *see also* 2000 AR 3407–08.

Another ongoing issue involved the problem that the aquaculture industry generally was not in compliance with conditions applicable under permits issued by the Army Corps of Engineers. *See* 2000 AR 347 (letter from NOAA Fisheries to Corps); *see generally* 33 U.S.C. § 403. There was also information that progress on constructing weirs to prevent farmed fish from entering DPS rivers was not progressing as hoped. *See, e.g.,* 2000 AR 290 ("seemingly endless delays and lack of progress"), 291 ("Another source of frustration to [Atlantic Salmon Authority] staff is the lack of information regarding the status of other aspects of the weirs project."); 2000 AR 850 (noting concerns about weir construction program); 2000 AR 311 (noting difficulties on Dennys River).

The Services were reasonable in considering aquaculture industry practices and in concluding that the aquaculture industry poses potentially significant threats to the continued survival of the Gulf of Maine DPS.

### b. Threats from Disease

After the 1997 withdrawal of the proposed rule, the Services began to receive information that increased their concern about disease threats. Two viral diseases, ISA and Salmon Swimbladder Sarcoma ("SSSV"), were discovered in the vicinity of the DPS rivers. Another disease, Cold Water Disease ("CWD"), caused by a bacterium was determined to be vertically transmitted—adult to egg—causing mortality in juvenile Atlantic salmon and, thus, a potentially serious threat to the DPS hatchery program. *See* 65 Fed.Reg. 69476, reproduced at 2000 AR 5057. The Services found that these three diseases, taken together, threaten both the wild DPS salmon and the health of hatchery brood stock needed for recovery of the DPS. *See* 65 Fed.Reg. 69477, reproduced at 2000 AR 5058.

With respect to ISA, representatives of the Services have stated that the "only known incident of wild salmon infection in Canada occurred under confined exposure to ISA infected aquaculture fish and a possible contaminated water supply," 2000 AR 7344, ¶ 21, and that this single "incident of ISA in captured wild fish does not confirm that Canada's wild fish presently carry the ISA virus in the wild or that the virus causes lethal disease in the wild." 2000 AR 7342–43, ¶ 15. The Services concluded that "ISA is not highly contagious to free-ranging wild fish" and that there is "no reason to suspect that free-ranging fish returning to the DPS rivers in [the] United States are any more susceptible." 2000 AR 7343–44, ¶ 18. Although, as the State points out, the Services were aware of ISA within the range of the DPS prior to the 1997 withdrawal of the listing decision, the record indicates that the Services' concern regarding ISA—a fatal disease—heightened as the disease moved closer to the United States. The Status Review reported that there was no effective treatment or vaccine for the disease and that other countries had destroyed infected fish due to a risk of infection. *See* 1999 Status Review, reproduced at 2000 AR 3201. Specifically, in 1998 ISA was found at two land-based facilities in Nova Scotia. *See* 1999 Status Review, reproduced at 2000 AR 3202. In 1999, some U.S. pens in Cobscook Bay were close enough to fall within the positive "quarantine zones" in New Brunswick waters. *Id.* A significant portion of adult DPS salmon swim near U.S. aquaculture pens in Cobscook Bay and in the vicinity of the Machias River. *See* 65 Fed.Reg. 69476, reproduced at 2000 AR 5057, 2000 AR 2666.

The State also argues that SSSV was no more of a threat to the DPS salmon in 1999 than it was in 1997. Even if the SSSV threat had not increased, the Services' concerns can nevertheless support the Services' listing decision. The Court notes that the Services' concerns over SSSV seems to relate solely to the threat it poses to hatchery fish necessary to recover the DPS salmon. The Pleasant River parr that were collected to create brood stock had to be destroyed because of SSSV. *See* 65 Fed.Reg. 69477, reproduced at 2000 AR 5058. However, the "true prevalence and impact of SSSV in the wild is NOT known." *See* 2000 AR 4135. Evidence in the administrative record supports the existence of the SSSV disease as a threat to the Gulf of Maine DPS. *See* 2000 AR 3203.

Finally, the State argues that the Services cannot rely on the studies of CWD because those studies were never made public. It was discovered in 1999 that CWD can cause early mortality and be transmitted from adult females to offspring. *See* 2000 AR 3897. The 1999 Status Review found the existence of CWD as a disease threat to Atlantic salmon in New England waters. *See* 1999 Status Review, reproduced at 2000 AR 3200. Therefore, regardless of whether studies have been completed and released to the public, consideration of the disease by the Services was not unreasonable.

The Services acted reasonably when they considered the potential effect of ISA, SSSV, and CWD on the overall health of the Gulf of Maine DPS.

#### c. Agricultural Water Use

The State's Conservation Plan characterized the water issue as a "water management challenge, not a water shortage problem." 1997 AR 4432, 4447. In 1999, the Services became concerned about the recent low water levels and the lack of adequate plans in place to address the issue of the water level and stream flow sufficient to support the wild Atlantic salmon population. *See* 2000 AR 1563, 1594, 3699. The Services found that the volume and timing of water withdrawals on the Pleasant, Machias, and Narraguagus Rivers for irrigation of blueberry and cranberry crops have the potential to adversely affect wild salmon by destroying or altering habitat. *See* 2000 AR 3154.

The Services were also aware that, in Maine, not all water withdrawals are regulated and the State had not completed the total water use management plan it had proposed in its conservation plan. 1997 AR 4576. Specifically, the State Department of Environmental Protection ("DEP"), which is responsible for the regulation of water withdrawal in organized towns, failed to put water use management plans in place by 1999 as the Services expected. *See* 2000 AR 3985, ¶ 52; *see also* 2000 AR 955 (Conservation Plan, noting that DEP "is drafting" rules to address water withdrawals on statewide basis). In October 1999, it was believed that plans would be in place for setting permit conditions for the 2000 irrigation season. *See* 2000 AR 3985, ¶ 52. Although the Services acknowledge that the State "made substantial progress in addressing the issue of agricultural water withdrawals," at the time of listing, "regulations and water use planning [were] not complete and in place to provide sufficient protection to the DPS." 65 Fed.Reg. 69477, reproduced at 2000 AR 5058. In addition, as of November 2000, there were no plans in place for setting permit conditions for the 2000 irrigation season. *See id.* The State's Land Use Regulatory Commission ("LURC") is responsible for regulating water withdrawals in unorganized towns. *See* 2000 AR 3154. The Services contend that although LURC controlled water withdrawals in

1999, the record suggests that LURC has failed to adopt adequate flow levels based on the best available science. *See* 2000 AR 423–25, 368.

The Services did not act in an arbitrary or capricious manner when they weighed the issues regarding the effect of agricultural water withdrawals on the Gulf of Maine DPS.

### d. Juvenile Survival Rate

Another basis on which the Services relied for reinitiation of the process as well as in making their listing decision was that the research conducted by the Maine Atlantic Salmon Commission and NOAA Fisheries in the Narraguagus River provided evidence that overwinter survival in fresh water was lower than expected, resulting in much lower than anticipated number of smolts leaving the river. *See* 65 Fed.Reg. 69461, reproduced at 2000 AR 5042; Additional References AR Doc. 52 at 1. However, the State points out that this conclusion is based on a study of fish in a single river—the Narraguagus. *Id.* Indeed, the Services themselves correctly noted in the July 1999 Status Review that "[i]t is unknown whether these overwinter survival rates are typical for the Narraguagus River on a long-term basis or if they are comparable to other rivers in the Gulf of Maine DPS." 1999 Status Review, reproduced at 2000 AR 3136. The researchers found that "a 126 % increase in large parr production resulted in only a 1.9 % increase in smolt production." Additional References AR Doc. 52, at 2. Although the State correctly points out that the total number of emigrating smolts increased from 1998 to 1999, there is nevertheless evidence something in the freshwater environment that is increasing juvenile mortality and ultimately inhibiting the recovery strategy. The Services were reasonable in considering the juvenile return data and concluding that such data supports the listing decision.

### e. Adult Returns

The Services received data after the withdrawal of the proposed listing rule indicating that the adult returns continued to be extremely low. 65 Fed.Reg. 69464, 2000 AR 5045. The Services note that the total documented adult returns to the DPS rivers declined between 1995 and 2000. 65 Fed.Reg. 69461, reproduced at 2000 AR 5042. Historically, counts are provided only for those rivers with trapping facilities and only for periods when those facilities were operational; therefore "the documented count does not represent a complete count of adult returns to the rivers within the DPS range." *Id.* In 1970, total adult returns in the DPS rivers numbered 415. *See* 2000 AR 2760. In 1980, total adult returns in DPS rivers numbered 326. *Id.* In 1990, total adult returns in the DPS rivers dropped to 60. *Id.* When the Services withdrew the 1997 listing rule, they relied on data that indicated marine conditions would improve over the next few years. 62 Fed.Reg. 66332, reproduced at 1997 AR 5784. Relying on that data, they projected that there would be an increase in adult returns, but the adult returns again declined to 22 for the DPS rivers in 2000. *See* 2000 AR 3237, 2760; 65 Fed.Reg. 69461, reproduced at 2000 AR 5042.

The State argues that the adult counts cannot support the listing decision because they are neither an accurate nor reliable indicator of the status of the DPS population. The State relies on a declaration made in support of the emergency listing, which stated that, "the recently reported low adult counts do not justify an emergency listing action," because there exists some variability in the quantity and conditions of the counts. 2000 AR 3978, at ¶ 24. The Services respond that at another

point, the declaration stated that the value of counts "lies in helping to identify longer term trends of changes in the populations." 2000 AR 3908, at ¶ 32. It was reasonable for the Services to consider the number of adult returns to the DPS rivers in making the listing decision and the Services' conclusion that the numbers were dangerously low is supported by the administrative record.

## IV. CONCLUSION

Accordingly, the Court **ORDERS** that Defendants' Motion for Summary Judgment be, and it is hereby, **GRANTED** and that State of Maine's Motion for Summary Judgment be, and it is hereby, **DENIED**. The Court further **ORDERS** that and Maine Businesses' Motion for Summary Judgment be, and it is hereby, **DISMISSED** for lack of standing.